UNITED STATES of America, Plaintiff–
Appellee, Cross–Appellant,

v.

Jeffrey Thomas WHALEY, Defendant–
Appellant, Cross–Appellee.

Nos. 92–6397, 92–6542.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 15, 1993.

Decided Jan. 10, 1994.

David G. Dake, U.S. Atty., Ed Schmutzer, Asst. U.S. Atty. (argued and briefed), Office of the U.S. Atty., Knoxville, TN, for U.S.

Anthony Philip Lomonaco (argued and briefed), Vaughan & Zuker, Knoxville, TN, for Jeffrey Thomas Whaley.

spirators provided the offenses were committed during and in furtherance of the conspiracy.

Before: MERRITT, Chief Judge;
JONES, Circuit Judge; and
CELEBREZZE, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge.

Defendant–Appellant Jeffrey Thomas Whaley appeals the admission into evidence of a statement he gave to law enforcement officials without an attorney present. The statement, in part a confession, led to his jury conviction on counts of possessing a firearm in relation to a drug crime and of possessing an illegal shotgun. We reverse the conviction and hold that the officials violated *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), by interrogating Whaley even though he had previously declined to talk without an attorney present. Because we reverse the conviction under *Edwards*, we do not address Whaley's more general argument that the confession was inadmissible as the product of coercion, nor do we address the United States' cross-appeal challenging the length of the sentence imposed.

I

On August 21, 1991, officers of the Knox County Metro Narcotics Unit executed a state search warrant on a house in Knoxville, Tennessee. The officers found five grams of cocaine packaged in seventeen small capsules, along with many empty vials. Whaley and several other individuals were inside the residence at the time. The officers also found several guns, including an illegal "sawed-off" shotgun, in various places around the residence. After finding the firearms, the officers called Special Agent Andy Anderson and other agents of the federal Bureau of Alcohol, Tobacco and Firearms (ATF) to the house.

At the house, Anderson read Whaley his *Miranda* warnings [1] and attempted to interview him. Whaley said he did not wish to talk at that time, and Anderson ended his questioning. Whaley was arrested on state charges of drug and weapons possession and was taken to the city jail. The next day he appeared before a state judge, who informed him of the charges against him. Whaley informed the judge he would be getting a lawyer, as he had had a conversation with his mother in which she indicated that she would find an attorney for him. It was not until about two weeks later that Whaley finally met with the lawyer that his mother had obtained.

On August 23, Whaley was transported from the city jail to the Knox County Jail for medical reasons. While he was in the holding area, ATF agents Phil Durham and Barry Waggoner came to the county jail to pick up another prisoner. While Durham was in another room doing paperwork regarding that prisoner, Waggoner, who had been with Anderson at the scene of Whaley's arrest, entered the holding area and recognized Whaley, who was about eight feet away from him with other prisoners between them. According to Waggoner, he and Whaley had a very brief conversation, of which he does not remember the exact words. He characterized the conversation as a few brief sentences and stated that an agent does not talk to someone in a holding area who might later be informing for the government, for the other prisoners might see them talking.

As Waggoner recounts it, the gist of the conversation can be summarized as follows. Waggoner said "I know you" to Whaley, and Whaley responded by saying, "Come here, I want to talk to you a minute." Without coming any closer, Waggoner responded, "About what?" and Whaley said, "I want to talk to you about me getting arrested." Since it was not his case, Waggoner said, "You need to talk to the guy handling your case," and the conversation ended.

Waggoner acknowledges that Whaley never said he wanted to make a statement and never said he wanted to talk to Anderson. Durham did not witness the conversation.

Over three weeks later, on September 12, Waggoner stepped into Anderson's office and said simply: "Oh yeah, Jeff Whaley wants to talk to you." [2] Anderson testified that he

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Waggoner testified that he saw Whaley on August 23, and that he told Anderson that Whaley wanted to talk the next time he saw him, which

was surprised by this, since Whaley had earlier said he did not wish to talk. Later that day, Anderson, accompanied by Special Agent Pam Bradley, went to the jail and told the guards he was there to interview Whaley. The jailers removed Whaley from his cell and put him in a private room to be interviewed.

When the agents enter the room, they identified themselves, and Anderson said, "I understand you want to talk to me." Whaley answered "Okay." J.A. at 69, 124. Anderson then read Whaley his *Miranda* rights, had Whaley sign a waiver of the rights, and told Whaley he would take a statement from him. In doing so, Anderson asked whether Whaley could read and write but did not explain the meaning of the word "waiver." When they got to the section that states, "I do not want a lawyer," Whaley said, "But I have a lawyer." Anderson asked him if he wanted his lawyer present, and Whaley said no and signed the waiver, saying that he did not know his lawyer's name and had only seen him once. Throughout this conversation, Anderson emphasized how Whaley's statement could help him, explaining the basics of how the Sentencing Guidelines work. Anderson told Whaley he was looking at a five-year mandatory minimum sentence and that this sentence could be reduced if he offered "substantial assistance" to the government in prosecuting the higher-level drug dealers Whaley knew.[3]

Whaley then gave Anderson a statement indicating that Whaley had been staying with two men named Dwight Tate and Gerald Parks at the Knoxville house that was searched by the officers. Tate and Whaley sold cocaine for Parks in small vials, and they received $5 for each vial they sold. Whaley stated that he never carried a gun when selling cocaine, and that none of the guns in the house belonged to him.

On November 27, 1991, Whaley was charged with using and carrying three firearms in relation to a drug trafficking crime in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c)(1) and with willfully possessing an unregistered gun in violation of 26 U.S.C. § 5861(d) and 5871. Upon Whaley's motion, a federal magistrate held a hearing in February 1992 on the issue of whether the statement to agent Anderson should be suppressed.

On April 22, 1992, the magistrate entered a Report and Recommendation that Whaley's suppression motion be denied. On April 30, Whaley filed objections to the report, and on May 26, the trial judge approved the report, denying Whaley's motion for suppression. A jury found Whaley guilty on both of the counts with which he was charged. At sentencing, the district court gave him the required 10-year minimum sentence for count one and a 21-month concurrent sentence for count two as well as two years of supervised release.

## II

In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Court developed a per se rule regarding the circumstances under which a waiver of a *Miranda* right can be found once a suspect invokes his right to counsel. In *Edwards,* a suspect stated that he wanted an attorney

---

was around September 12. The record reveals some confused discussion but no explanation of why it took three weeks for Waggoner to see Anderson. Anderson likewise testified that he thinks Waggoner spoke to him on September 12, which is the date he then went to the jail to interrogate Whaley.

**3.** Whaley disputed the agents' testimony. He testified that he was at the county jail on August 23, and he saw agent Waggoner with another agent whom he did not recognize at the time. Contradicting Waggoner's testimony, Whaley denies speaking or gesturing to the agents. According to Whaley's testimony, he was suddenly removed from his cell after three weeks in jail and taken to the room where Anderson questioned him. Whaley says that he answered "okay" when Anderson said he heard Whaley wanted to speak to him because, "I didn't know what was going on. I was just agreeing with him because he was there.... The officers just came and took me out of the cell, and they put me in a room and they said they wanted to talk to me about something." J.A. at 70. Whaley agrees that Anderson read him his *Miranda* rights, that he said he didn't want his lawyer there, and that he signed the waiver and the confession.

As the district court accepted the government witnesses' version of the facts, it is that version that we will be considering in this appeal.

before he gave a statement to the police, at which time the interrogating officer ceased his questioning. The next day, however, other officers came to the jail and again questioned the suspect, who eventually acquiesced and gave a statement implicating himself in a crime. The Court ordered the statement suppressed, holding that when a suspect invokes his *Miranda* right to counsel, all questioning of that suspect must cease unless the suspect himself "initiates" further communication. Any waiver of the right to counsel is invalid if the police, rather than the suspect, initiated communication. As the Court stated:

> When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85. Subsequent decisions have established *Edwards* as a vital part of constitutional law that is designed to protect an accused in police custody from being badgered by police officers into waiving previously asserted *Miranda* rights. *See, e.g., Minnick v. Mississippi,* 498 U.S. 146, 151–54, 111 S.Ct. 486, 490–91, 112 L.Ed.2d 489 (1990) (holding that police cannot reinitiate interrogation even where defendant has consulted with counsel in the interim); *Arizona v. Roberson,* 486 U.S. 675, 682–83, 108 S.Ct. 2093, 2098–99, 100 L.Ed.2d 704 (1988) (holding that the *Edwards* rule applies even when the suspect's request for the cessation of questioning occurs in a separate criminal investigation).

■ *Edwards* has generally been extolled for its "clear and unequivocal" rule. *Minnick,* 498 U.S. at 151, 111 S.Ct. at 490. Police cannot reinterrogate a suspect who does not initiate a discussion of his offense. Whether a suspect has done so, however, can occasionally present a difficult question. In the leading case on the issue, *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the Court split 4–4 regarding the proper test to be used. In that case, Oregon police arrested Bradshaw after he admitted committing the crime of giving liquor to a minor. Bradshaw was also suspected of drunk driving and manslaughter, but when questioned about that offense, he denied it and stated that he wanted an attorney before answering further questions. The police terminated the questioning. Later, while Bradshaw was being driven several miles from the police station to the jail, he asked an officer, "Well, what is going to happen to me now?" The officer answered that Bradshaw had requested an attorney and should not be talking to him unless he desired to talk out of his own free will. Bradshaw said he understood and then discussed the offense with the officer, who suggested Bradshaw take a polygraph test. The next day, Bradshaw signed a waiver of his *Miranda* rights and took a polygraph. The administrator of the test expressed doubts about whether Bradshaw was telling the truth. Bradshaw then confessed to the alleged offenses, a trial court admitted his confession, and he was convicted of manslaughter and drunk driving.

The Court held that the confession was properly admissible under *Edwards,* for Bradshaw had initiated the conversation with the officer. Justice Rehnquist, for a four-Justice plurality, found that:

> There can be no doubt in this case that in asking, "Well, what is going to happen to me now?", respondent "initiated" further conversation in the ordinary dictionary sense of that word. While we doubt that it would be desirable to build a superstructure of legal refinements around the word "initiate" in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to "initiate" any conversation or dialogue. There are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly

said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally "initiate" a conversation in the sense in which that word was meant by *Edwards*.

Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. It could reasonably have been interpreted by the officer as relating generally to the investigation. That the police officer so understood it is apparent from the fact that he immediately reminded the accused that "you do not have to talk to me," and only after the accused told him that he "understood" did they have a generalized conversation. On these facts we believe there was not a violation of the *Edwards* rule.

*Bradshaw*, 462 U.S. at 1045–46, 103 S.Ct. at 2835 (citation omitted).

Justice Powell joined the plurality's result but not its reasoning, as he preferred a differing analysis from that in *Edwards*. Justice Marshall wrote a dissent joined by three other Justices. Marshall agreed with the plurality that, to constitute initiation under *Edwards*, a suspect's inquiry must demonstrate "a desire to discuss the subject matter of the criminal investigation," *Id.* at 1055, 103 S.Ct. at 2840, but Marshall was baffled at how the plurality applied that standard to the particular case. To Marshall, it was plain that the question "what is going to happen to me now?" did not indicate a generalized desire but was simply a normal reaction to being placed in a police car for a trip to some destination. Marshall would have held that the officer took advantage of Bradshaw's routine question and began discussions, which

occurred with the compulsion inherent in a custodial setting where a suspect does not have a lawyer.

■ In his *Bradshaw* concurrence, Justice Powell made much of an alleged conflict between the plurality and the dissenting interpretations of *Edwards*.[4] There is, however, little difference between the way the plurality and the dissent phrased the standard to apply in determining what constitutes an initiation. The plurality said that an initiation occurs when a suspect "evince[s] a willingness and a desire for a generalized discussion about the investigation," *Bradshaw*, 462 U.S. at 1045–46, 103 S.Ct. at 2835, while the dissent said the suspect must "demonstrate a desire to discuss the subject matter of the investigation." *Id.* at 1055, 103 S.Ct. at 2840. The dispute between the *Bradshaw* plurality and the dissent was over application of the standard to the facts. The dissenters even indicated that they believed they were agreeing with the plurality on the standard to be applied, and they used only the words "generalized" and "desire" from the plurality's own test to criticize the plurality's application of the law. *Id.* at 1055, 103 S.Ct. at 2840. We therefore hold that an *Edwards* initiation occurs when, without influence by the authorities, the suspect shows a willingness and a desire to talk generally about his case. As we and other circuits have made clear, not every statement from a suspect's mouth shows such a desire. *See United States v. Soto*, 953 F.2d 263, 265 (6th Cir.1992) (indicating desire to keep belongings separate from those of co-defendant is not initiation); *Desire v. Attorney Gen. of Calif.*, 969 F.2d 802, 804–05 (9th Cir.1992) (asking codefendant "Did you tell him everything?" in front of an officer not initiation); *Jacobs v. Singletary*, 952 F.2d 1282, 1294 (11th Cir.1992) (asking officer "Where are my children?" not initiation); *Christopher v. Florida*, 824 F.2d 836, 845–46 (11th Cir.1987) (asking question in response to police officer's interrogation

---

4. Justice Powell disagreed with the rule in *Edwards*, preferring an approach that simply evaluates all the facts and circumstances of a case. 462 U.S. at 1047–51, 103 S.Ct. at 2836–38. He argued that the *Bradshaw* disagreement between Justices Rehnquist and Marshall showed the

flaws in *Edwards*, and the Third Circuit has similarly alleged a direct conflict between Rehnquist and Marshall that needs resolution. *United States v. Velasquez*, 885 F.2d 1076, 1085 (3d Cir.1989).

not initiation), *cert. denied,* 484 U.S. 1077, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988).

In the current case, it is undisputed that Whaley invoked his right not to speak without counsel, both when Anderson first tried to question him at the time of the drug search and again when he appeared before a state court judge. The question we must answer, then, is whether he "initiated" the later conversation with Anderson that led to his waiver of his rights and his counsel-less statement.

We begin our analysis of the facts before us by observing that, in itself, Anderson's interrogation of Whaley was manifestly unconstitutional under *Edwards.* Whaley certainly did not initiate the interrogation when Anderson had him removed from his cell and then began the questioning. It is irrelevant that Whaley did not at that point resist the interrogation, as the whole point of *Edwards* is to prevent officials from badgering defendants into waiving their asserted right to counsel through repeated questioning. A waiver of an expressed right to counsel "cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards,* 451 U.S. at 484, 101 S.Ct. at 1885.

The government argues that the brief conversation Whaley had with agent Waggoner three weeks earlier initiated the interrogation. Taken by itself, it is a difficult question whether that conversation constituted an initiation. In the momentary exchange, which took place while Whaley was with several other prisoners in a holding room waiting for a medical appointment, Waggoner—not Whaley—spoke first. Whaley responded by asking Waggoner to come closer because, "I want to talk to you about me getting arrested." When Waggoner said that Whaley would have to talk to his case agent, Whaley then said nothing else.

In *Bradshaw,* a divided Court found that an initiation occurred where a defendant had merely asked "what is going to happen to me now?" This implies that the unsolicited statement "I want to talk to you about me getting arrested" would constitute an initiation when compared with the *Bradshaw*

facts, even though it is unclear whether a defendant who says as much wants to give a statement or not. In *Bradshaw,* however, the defendant spoke first. Here, Whaley only spoke after Waggoner acknowledged him, and Whaley said nothing after being told he should speak to Anderson. It is a close question whether this exchange might, by itself, constitute an initiation under *Bradshaw.*

However, in the present case, we do not need to decide this question, because after this exchange nothing happened for three weeks. The authorities did not contact Whaley, and Whaley made no effort to tell anyone—including agent Anderson—that he wanted to talk about the case. Whether or not Whaley's exchange with Waggoner might have at the time constituted an *Edwards* initiation, given that Whaley did nothing else during the succeeding three-week period, his actions certainly do not show a willingness and a desire to speak generally about his case. Therefore, as in *Edwards,* when Anderson removed Whaley from his cell and interrogated him without counsel present, he violated Whaley's constitutional rights.

In its argument to the court, the government ignores the three-week time lag, making no attempt to refer us to cases that might support the finding of an initiation here and relying wholly on *Edwards* itself in asserting that Whaley initiated the conversation. Likewise, we can find no case that finds an initiation on facts comparable to these.

■ Instead of case law, the government relies heavily on what it believes to be our standard of review regarding whether an initiation occurred, arguing that whether an initiation occurred is a question of fact that must be upheld unless clearly erroneous. Government Br. at 9. This is incorrect. While we accept, unless clearly erroneous, the facts that the district court found, whether those facts together constitute an "initiation" under *Edwards* is a legal question we review *de novo.* Thus, we have accepted the government witnesses' testimony as to the conversations that occurred (as did the magistrate and district court) and have not considered Whaley's contradictory account. Our analysis then applies the constitutional test

laid out in *Edwards* to those facts. The *Bradshaw* Court performed this same type of review as it accepted the facts developed by the Oregon courts and then reversed those courts in finding that the fact situation constituted an initiation as a matter of law.

That much stated, we do note that we question the magistrate's reasoning even in finding the facts. The magistrate accepted the government witnesses' version of events instead of Whaley's mainly because he decided Whaley was not credible in asserting that at the time he did not understand why Anderson came to interrogate him. In doing so, the magistrate inaccurately characterized Anderson's initial interrogation comment to Whaley as actually referring to Waggoner. The mistaken quotation of what Anderson said makes Whaley appear not credible when he said he did not know what was going on. As this was the only problem with Whaley's testimony that the magistrate articulated, its erroneous premise calls into question the entire credibility finding.[5]

Finding that Whaley initiated a conversation under the circumstances in this case would undermine the protections of *Edwards* by allowing the police to wear down a suspect's resistance to waiving his right to counsel by repeated questioning as the suspect spends time spent in prison. We therefore hold that Whaley's statement should have been suppressed.

### III

The error here was not harmless beyond a reasonable doubt. *See Chapman v.* *California,* 386 U.S. 18, 24–26, 87 S.Ct. 824, 828–29, 17 L.Ed.2d 705 (1967); *United States v. Soto,* 953 F.2d 263, 265 (6th Cir.1992). We therefore REVERSE Jeffrey Thomas Whaley's conviction because his statement/confession was taken in violation of his constitutional rights. Whaley invoked his right to counsel, did not subsequently initiate discussion with the police under *Edwards,* and should not have been reinterrogated without counsel present.

---

**5.** The magistrate wrote:

> Agent Anderson stated that he began his interview with Whaley by stating "Agent Waggoner told me that you wanted to talk to me" and Whaley responded, "Okay." Whaley's explanation for this response, "I just didn't know what was going on" was not credible.

J.A. at 124. However, as the magistrate stated earlier in his report, Anderson only identified himself and said "I understand you want to talk to me"; there is absolutely no evidence he made a specific reference to the earlier conversation between Whaley and Waggoner. Though at the hearing Anderson acknowledged that he did not remember exactly what he said, he testified twice that he said "I understand you want to talk to me" and did not refer to the earlier "conversation" between Whaley and Waggoner. J.A. at 21,

48. Whaley's response of "Okay" is ambiguous in the first place, but it is much more credible that Whaley was confused about why Anderson was there when Anderson said only "I understand you want to talk to me," than if he referred to Waggoner.

Moreover, the magistrate did not mention the three-week time lag between Whaley's conversation with Waggoner and his interrogation by Anderson, which makes it, in our view, entirely believable that Whaley did not realize what spurred Anderson to question him. Having spent three long weeks in prison, it would not be surprising if Whaley did not immediately realize that his sudden removal for questioning was based upon a momentary exchange he had in a holding cell while waiting for a medical appointment that long before.