**NOT RECOMMENDED FOR PUBLICATION**

File Name: 13a0188n.06

**Nos. 10-5939 & 11-6228**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Feb 20, 2013**

DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE MIDDLE DISTRICT OF |
| James C. McWhorter, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |

Before: SILER, COLE, and SUTTON, Circuit Judges.

**SILER**, Circuit Judge. Defendant James C. McWhorter seeks reversal of the district court's determination that McWhorter's arrest warrant was valid, the denial of his motion to suppress evidence, the denial of his motion for judgment of acquittal, the district court's sentence, and the denial of his motion for a new trial. For the reasons that follow, we **AFFIRM**.

I.

In 2006, the police department in Sparta, Tennessee began investigating a series of counterfeit checks being passed at local businesses. Officer Allen Selby went to one such business, Floyd's Hometown Food Center ("Floyd's"), and interviewed a store clerk who had accepted a counterfeit check. The clerk gave Selby a description of the person who had passed the check. Selby returned to the store several days later with a photo array, and the clerk identified McWhorter as the person who had passed the counterfeit check.

Thereafter, Selby went to a local judicial commissioner to obtain an arrest warrant. Selby purposefully withheld the name of the clerk from the commissioner because the clerk was a juvenile at the time. The commissioner typed the affidavit and warrant while Selby recited the facts from his report. Selby reviewed the affidavit and signed it, but did not read it word for word. The affidavit contained a misstatement. Specifically, it stated: "Officer Selby presented D.L. photo's to Floyd's Home Town Foods, Franky Floyd, who did I.D. the man in the picture as James C. McWhorter." Franky Floyd is the wife of one of the two owners of Floyd's, but she was never interviewed by Selby and she never identified McWhorter. However, Selby did interview Debbie Floyd, the wife of the other owner of Floyd's. Selby confused the two names when reciting the facts to the commissioner. He did not tell the commissioner that Franky Floyd identified McWhorter, but rather that "the clerk" had done so.

The Metropolitan Nashville Police Department ("Metro"), which had been investigating a counterfeit check cashing scheme in and around Nashville involving several suspects, including McWhorter, learned about the active arrest warrant in White County, TN. McWhorter was arrested and interviewed by Metro Detective Mike Park at the Criminal Justice Center ("CJC") on November 8, 2006. Park read McWhorter his *Miranda* rights and McWhorter signed a *Miranda* waiver form.

Later, Selby and Special Agent Randy Crain read McWhorter his *Miranda* rights, which McWhorter indicated he understood and waived. After some initial questioning by Selby and Crain, McWhorter began asking about assurances for his wife, who had also been arrested. The officers made no assurances or promises and repeatedly told McWhorter that he would need to speak to the district attorney regarding any promises or assurances in his wife's case. McWhorter then asked to

speak to the district attorney. The officers obliged his request and made a phone call to Assistant District Attorney Doug Crawford. McWhorter requested favorable treatment for his wife in consideration for his cooperation with the investigation, and while Crawford provided no assurances or guarantees, he indicated that the authorities would not be interested in his wife if McWhorter was in fact responsible for the crimes in question. Crawford did not agree to put anything in writing.

McWhorter insists that an agreement was made whereby his wife would be released from jail if he fully cooperated with the investigation and that Crawford would do everything in his power to make sure that McWhorter's wife would never serve a day in prison and would get probation at the worst. McWhorter insists that Crawford told him this agreement would be put into writing and brought to him the following day.

After the phone call, McWhorter requested to speak with his wife who was being held nearby at the Davidson County Sheriff's Department. McWhorter was taken to the Sheriff's Department and spoke with his wife for approximately fifteen minutes. On the walk back to the CJC, McWhorter and Park had a short, but heated, argument where Park responded to disparaging remarks that McWhorter had made earlier about Metro police officers. McWhorter ultimately ended the argument by stating that he did not want to talk to Park any further.

McWhorter and the officers re-entered the CJC, where Selby and Crain joined McWhorter in one of the interview rooms. Prior to McWhorter's cooperation and inculpatory statements, he again sought assurances regarding his wife's case. McWhorter then made inculpatory statements and consented to a search of his home and computers.

Officers searched McWhorter's home that evening and seized hundreds of fake IDs, fake checks, computers, printers, and other evidence. McWhorter was transported to the White County jail the next morning (November 9) where he was able to determine that his wife was still in jail. Selby attempted to question McWhorter that morning, but McWhorter invoked his right to counsel and declared that he would not talk until his wife was freed.

In March 2007, Special Agent Donna Clark of the Tennessee Department of Corrections ("TDOC") interviewed McWhorter at the Brushy Mountain Correctional Complex in Petros, TN, where McWhorter was being held for parole violations. Clark was investigating counterfeited TDOC checks that had been cashed and the investigation led her to McWhorter. At the time of the interview, McWhorter had been facing criminal charges, with assigned counsel, in at least Putnam and Warren counties in Tennessee. The charges included criminal simulation, forgery, and theft. Clark provided McWhorter with *Miranda* warnings and he waived those rights in writing. McWhorter denied any involvement with the counterfeit TDOC checks.

In May 2007, Special Agent Nathan Landkammer of the United States Secret Service, along with Crain, interviewed McWhorter at the Riverbend Maximum Security Complex in Nashville, TN, where McWhorter was being held at the time. Landkammer had been contacted by Crain and was investigating federal offenses involving counterfeit identification documents, identity theft, and conspiracy. Landkammer provided McWhorter with *Miranda* warnings and he waived those rights in writing. During the interview, Landkammer became aware that McWhorter was currently facing state charges. After determining what offenses the state charges alleged, Landkammer expressed concern about discussing the state charges without McWhorter's attorney present and emphasized

that he only wanted to discuss the federal offenses that he was investigating. McWhorter then made inculpatory statements to Landkammer regarding the federal offenses.

McWhorter was indicted by a federal grand jury in August 2007. He filed a motion to suppress the interviews he gave on November 8, 2006, the evidence seized from his home, and the interviews that he gave to Clark and Landkammer in 2007. He also challenged the validity of his arrest warrant and requested a *Franks* hearing. The motions were denied. At trial, at the close of the government's proof, McWhorter moved for a judgment of acquittal with respect to counts 2, 4, and 5 of the indictment. That motion was denied and McWhorter was convicted of all five counts. He was sentenced to 124 months of imprisonment. Subsequent to the original appeal, McWhorter filed a motion for a new trial based on new evidence. The district court denied the motion. McWhorter appealed the district court's order and we consolidated the two appeals.

II.

McWhorter has appealed five distinct rulings by the district court and raised nine separate issues on appeal. He first challenges the district court's finding that the arrest warrant was valid. He argues that there was a material misrepresentation in his arrest warrant that was "at a minimum reckless disregard and perhaps intentional." He contends that without the false misrepresentation, the arrest warrant lacks probable cause, and he is therefore due relief under *Franks v. Delaware*, 438 U.S. 154 (1978).

McWhorter's claim fails for two reasons. First, regardless of any defects in the arrest warrant, the arrest was valid because it was supported by probable cause. And second, McWhorter did not make a substantial preliminary showing under *Franks*.

The district court found that there was probable cause for McWhorter's arrest. We agree and do not find the district court's factual findings to be clearly erroneous. A clerk at Floyd's identified McWhorter as having passed the fraudulent check. This constitutes probable cause for McWhorter's arrest and "a warrant is not required to effect a public arrest so long as the officers possess probable cause." *United States v. Calandrella*, 605 F.2d 236, 246 (6th Cir. 1979). Consequently, "even where an arrest warrant is found to be defective, the simple existence of probable cause will support the officer's action." *Id.* Importantly, the Metro officers who arrested McWhorter relied in good faith on the warrant procured by Selby. Therefore, because the judicial commissioner was responsible for the defect in the warrant, the good faith exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897 (1984), applies. *See Arizona v. Evans*, 514 U.S. 1, 14-16 (1995).

Second, McWhorter was not entitled to a *Franks* hearing because he failed to make a substantial preliminary showing that the misstatement in the arrest warrant was made knowingly, intentionally, or with reckless disregard. *Franks*, 438 U.S. at 155-56. The district court found that Selby did not communicate the false statement to the judicial commissioner who typed the warrant affidavit, but that the false statement was created through inadvertence on the part of the commissioner and poor proofreading on Selby's part. This finding is not clearly erroneous. McWhorter does not advance a credible argument that Selby intentionally told the commissioner that Franky Floyd identified him. Therefore, McWhorter's argument fails and further analysis under *Franks* is unnecessary.

III.

McWhorter claims that he invoked his right to remain silent on November 8, 2006 prior to making inculpatory statements, and that his right to silence was not scrupulously honored. Alternatively, he argues that his inculpatory statements were not voluntarily made. Additionally, he argues that Clark and Landkammer violated his Fifth Amendment right to counsel when they interviewed him in 2007. McWhorter contends that all statements taken by Clark and Landkammer at their respective interviews in 2007 should have been suppressed at trial.

The district court held two different hearings on these particular issues and denied McWhorter's motion to suppress and motion to reconsider the motion to suppress. In reviewing a district court ruling on a motion to suppress, we apply the clearly erroneous standard to findings of fact and de novo review for conclusions of law. *Unites States v. Bradshaw*, 102 F.3d 204, 209 (6th Cir. 1996).

A.

McWhorter first argues that the statements he made to Selby and Crain on November 8, 2006 should have been suppressed at trial because the officers did not scrupulously honor his right to remain silent. McWhorter supports this assertion by arguing that he unambiguously invoked his right to remain silent when he told Park that he did not want to talk to him any more on the walk back to the CJC after McWhorter had spoken with his wife at the Sheriff's Department.

The district court found that McWhorter told Park "I don't want to talk to you anymore" after having a short, but heated, argument with Park while walking back the to CJC. The argument centered around Park's advice regarding disparaging comments McWhorter had previously made

about Metro officers.  Park understood McWhorter's statement to be directed at him and to mean that McWhorter did  not want to hear any more advice from Park.

The district court found that McWhorter was no longer angry and returned to being calm and cooperative after thirty seconds or less.  When McWhorter and the officers returned to the interview room in the CJC, McWhorter told Selby and Crain "I'll tell you about Sparta if you agree to do what you said you were going to do."  McWhorter then made inculpatory statements over the next one to two hours.  The district court concluded that McWhorter's statement was ambiguous when placed in context and that it was not an unequivocal assertion of his right to remain silent.

An accused who wants to invoke his right to remain silent must do so unambiguously. *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259-60 (2010).  Therefore, for McWhorter to have asserted his right to remain silent, he must have unambiguously and unequivocally invoked his right to remain silent.  McWhorter does not argue the factual findings of the district court.  Instead, he argues that the district court's conclusion of law that McWhorter's statement was not an unambiguous assertion of his right to remain silent was incorrect.  Upon de novo review, we conclude that McWhorter's statement to Park was not an unambiguous assertion of his right to remain silent.

From the unchallenged facts, the context makes it clear that McWhorter specifically directed his statement only to Park and that the statement had nothing to do with McWhorter's right to remain silent, but instead was a response indicating that McWhorter did not want Park to further lecture him on his statements about the Metro police force.  The facts contradict McWhorter's assertion that he wished to remain silent from that point forward.  Thus, his argument fails.

B.

McWhorter alternatively argues that his inculpatory statements on November 8, 2006 were not voluntarily made. In short, he argues that, at the very least, he made an agreement with Selby that his wife would not be prosecuted and that she would be released from jail in consideration for his cooperation and statements. He contends that it was this agreement that Selby promised to get in writing and that this agreement was the only reason he made any inculpatory statements. Thus, he argues, because Selby and the state authorities did not follow through with their part of the agreement, his statements were coerced and not voluntary.

"In determining the voluntariness of a confession, a reviewing court will not disturb the trial court's findings concerning specific events surrounding the confession unless clear error appears on the record." *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003) (quoting *United States v. Wrice*, 954 F.2d 406, 410-11 (6th Cir. 1992)). We have established three requirements to find a confession involuntary due to police coercion: (1) the police activity must be objectively coercive; (2) the coercion must be sufficient to overbear the defendant's will; and (3) the alleged police misconduct must be the crucial motivating factor in the defendant's decision to offer the statement. *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999). Additionally, "promises of leniency may be coercive if they are broken or illusory." *Johnson*, 351 F.3d at 262. In determining whether a confession was involuntary, the court looks to the totality of the circumstances concerning whether a defendant's will was overborne. *Mahan*, 190 F.3d at 422.

Here, the issue of voluntariness turns on the factual determination by the district court that McWhorter "was not promised that his wife would not be charged, that she would serve no jail time,

or that she would be immediately released from jail." Therefore, in order to rule in favor of McWhorter on the issue of voluntariness, we must conclude that this finding is clearly erroneous. McWhorter's argument fails under this standard.

Although the interrogation transcript makes it clear that McWhorter was most likely promised something regarding his wife, and the promise was supposed to be put in writing, it is not clear exactly what it was that he was promised. Prior to McWhorter's cooperation and inculpatory statements, he sought assurances regarding his wife's case, stating "I'm backing mine up immediately," to which Selby responded "[w]ell, I'm backing mine up. I told you I'd get the thing in writing." Selby further stated "I give you my word Chris, I mean, that's all I can do tonight. What good is it gonna do me if she sits in jail or prison?" The statements by Selby make it clear that he made a promise to McWhorter, that the promise had to do with McWhorter's wife, and that Selby was going to get the promise in writing. However, the exact parameters of the promise cannot be ascertained from the interrogation transcript.

The district court found that Selby only promised McWhorter that if he cooperated, his cooperation would be made known to the prosecutor and that if he was responsible for all the criminal activity, the state would not be interested in prosecuting his wife. It found McWhorter's testimony here, and repeatedly throughout the suppression hearing, to lack credibility. The district court's finding is not clearly erroneous. Therefore, McWhorter's argument fails.

C.

Lastly, McWhorter argues that because he invoked his *Miranda* right to counsel on November 9, 2006 in the White County jail, under *Edwards v. Arizona*, 451 U.S. 477 (1981), Clark

and Landkammer violated his Fifth Amendment right to counsel when they interviewed him without the presence of his assigned counsel in 2007.

An accused who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85. Moreover, police may not question a defendant about any unrelated crimes after invocation of the right to counsel, even if such crimes are the subject of a separate investigation. *Arizona v. Roberson*, 486 U.S. 675, 682 (1988). Further, where a defendant has requested and been provided counsel, police may not reinitiate an interrogation without the presence of counsel. *Minnick v. Mississippi*, 498 U.S. 146, 152-53 (1990).

However, in *Maryland v. Shatzer*, the Court held that after a 14-day break in custody the police may ask an accused to waive his *Miranda* right to counsel even though he has previously invoked his *Miranda* right to counsel while in custody. 130 S. Ct. 1213, 1222-23 (2010). Additionally, lawful imprisonment imposed upon the conviction of a crime does not create the coercive pressures identified in *Miranda*, and therefore it does not constitute custody for *Miranda* purposes. *Id.* at 1224-25.

The circumstances of McWhorter's invocation of his *Miranda* right to counsel and the subsequent interviews by Clark and Landkammer do not implicate the same concerns of the defendants in *Edwards* and its progeny. The protections in *Edwards* and its progeny were designed to "prevent police from badgering a defendant into waving his previously asserted *Miranda* rights." *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991) (quoting *Michigan v. Harvey*, 494 U.S. 344, 350

(1990)). Importantly, the defendants in *Edwards*, *Roberson*, and *Minnick* were all re-interrogated within three days after they had invoked their *Miranda* right to counsel. *Edwards*, 451 U.S. at 478-79; *Roberson*, 486 U.S. at 678; and *Minnick*, 498 U.S. at 148-49.

The facts here more closely resemble the facts from *Shatzer*. In *Shatzer*, the defendant, who was incarcerated on a prior conviction, invoked his *Miranda* right to counsel when questioned about a new allegation. 130 S. Ct. at 1217. The interview was terminated and Shatzer was released back into the general prison population. *Id.* Three years later, another detective reopened the case and attempted to question Shatzer, who was still incarcerated, about the same allegation for which he previously invoked his right to counsel. *Id.* at 1217-18. However, this time Shatzer waived his *Miranda* rights and gave inculpatory statements. *Id.* at 1218. The Court held the statements were admissible against Shatzer. *Id.* at 1227.

Here, McWhorter invoked his *Miranda* right to counsel on November 9, 2006, while he was in custody at the White County jail for his arrest on the White County warrant. Clark interviewed McWhorter on March 23, 2007, more than four months after he invoked his right to counsel. More importantly, this was more than three months after McWhorter was transferred from the White County jail, where he had been held for the new charges, to Brushy Mountain Correctional Complex, where he was now being held for violating the terms of his parole from a prior conviction. Thus, because McWhorter was being lawfully imprisoned for a prior conviction, he had not been in *Miranda* custody for over three months, much more than the 14-day cleansing period required by *Shatzer* before a defendant can be re-interrogated.

Hence, there was no presumption of involuntariness under *Edwards* when McWhorter was questioned by Clark and Landkammer in March and May, 2007, respectively.[1] Because McWhorter was given *Miranda* warnings and because he waived his *Miranda* rights on both occasions, all statements from those interviews were admissible. Therefore, we reject McWhorter's argument that his statements to Clark and Landkammer were inadmissible under *Edwards*.

IV.

The third order challenged on appeal is the district court's denial of McWhorter's motion to acquit based on theories of conspiracy or aiding or abetting in count five of the indictment. McWhorter argues that the government's witness, Chad Vincent, was not credible and that there was not enough evidence to support a conviction on count five. We review a district court's refusal to grant a motion to acquit de novo. *United States v. Keeton*, 101 F.3d 48, 52 (6th Cir. 1996).

Count five of the indictment was a charge of aggravated identity theft under 18 U.S.C. § 1028A. Vincent testified that McWhorter provided the name, social security number, and other necessary information of a real person in their effort to make an identification card that contained verifiable information of a real person. McWhorter created the identification card using the same computer and printer he had used to make other identification cards. Vincent unsuccessfully attempted to cash a fake check using the identification card created by McWhorter.

---

[1] McWhorter was transferred to Riverbend Maximum Security Complex on April 6, 2007, but continued to be held for violating the terms of his parole from a prior conviction. The interview by Landkammer occurred at Riverbend.

McWhorter's argument depends on discrediting Vincent's testimony as unreliable. However, evaluations of a witness's credibility are made by the jury and not by the court. *United States v. Graham*, 622 F.3d 445, 448-49 (6th Cir. 2010). In light of Vincent's testimony and the testimony in general throughout the trial regarding the conspiracy, we agree with the district court's denial of McWhorter's motion to acquit on count five.

V.

Next, McWhorter asserts that he is entitled to a new trial. His motion for a new trial claimed there was newly discovered evidence that was kept from him by the prosecution. The district court denied the motion because of a lack of any evidence that would qualify for disclosure under *Brady v. Maryland*, 373 U.S. 83 (1963). McWhorter reasserts his argument that the government withheld material exculpatory evidence under *Brady*.

Under Fed. R. Crim. P. 33(b)(1), the following elements must be established: (1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal. *United States v. Jones*, 399 F.3d 640, 648 (6th Cir. 2005). We review a district court's denial of a motion for a new trial based on new evidence under the abuse of discretion standard. *United States v. Olender*, 338 F.3d 629, 635 (6th Cir. 2003).

McWhorter's argument centers around a police report filed by Selby after his initial visit to Floyd's following its report of the passing of a fraudulent check. In his report, Selby stated that "the incident was also videoed [sic] taped." McWhorter initially raised this issue during trial and was told that the government did not possess and was not aware of any such video. After the trial concluded,

- 14 -

McWhorter's counsel visited Floyd's, where he noticed that Floyd's had the equipment and ability to conduct video surveillance. Additionally, McWhorter claims that still photos from the incident at Floyd's indicate that a video of the incident exists. McWhorter argues that he was not the person who passed the check at Floyd's and that a video would be material and exculpatory.

However, McWhorter acknowledges that the government has consistently denied that it has ever possessed a video of the incident and that it has consistently denied that such video ever existed. The government asserts that Selby's reference to a video tape of the incident was an inadvertent error, noting that on the same day that he visited Floyd's, Selby had visited another defrauded store that did have video surveillance capabilities.

McWhorter's argument fails for two reasons. First, he cannot establish that a video of the incident exists. Second, all other evidence mentioned by McWhorter was either available at trial or could have been discovered before or during trial with due diligence. His argument concerning the possible existence of the video tape is based on Selby's police report and the still photos from the incident at Floyd's, both of which were produced prior to trial. McWhorter's assertion—that Floyd's had the capability to conduct video surveillance in 2010, more than four years after the incident—is immaterial and irrelevant to the question of whether there is a video of the incident that occurred in 2006. We affirm the district court's denial of McWhorter's motion for a new trial.

VI.

Lastly, McWhorter makes three separate arguments regarding the application of the sentencing guidelines. First, that the enhancement for an authentication feature under USSG § 2B1.1(b)(10)(A)(ii) and (B)(ii) should not have been applied. Second, that the addition of one

criminal history point for McWhorter's 2000 Missouri conviction was in error.  And third, that the

district court failed to consider certain proposed findings of the Sentencing Commission and the

pending amendment to remove the recency adjustment of USSG § 4A1.1(e).

We review sentences for procedural and substantive reasonableness under a deferential

abuse-of-discretion standard.  *United States v. Novales*, 589 F.3d 310, 314 (6th Cir. 2009).  However,

although the application of the sentencing guidelines is one of the factors listed in 18 U.S.C. §

3553(a), we review the application of the sentencing guidelines de novo.  *United States v. Duckro*,

466 F.3d 438, 444 (6th Cir. 2006).

A.

McWhorter argues that the enhancement for the production, possession or use of any

authentication feature under USSG § 2B1.1(b)(10)(A)(ii) and (B)(ii) should not have been applied

because: (1) applying this enhancement constitutes impermissible double counting for the same

conduct; and (2) his conduct did not meet the requirements of the enhancement.[2]

First, he argues that the application of this enhancement constitutes impermissible  double

counting because the conduct in question – producing, possessing, and using authentication features

– has already been factored into his sentence in the base offense level.  This argument is without

merit.

McWhorter notes that he was convicted of producing false identification documents under

18 U.S.C. § 1028(a)(1) and  that this conviction was part of the base offense level.  His argument

---

[2]     McWhorter was sentenced in July 2010 and therefore the 2009 edition of the Guidelines
Manual applies to his sentence and this appeal pursuant to USSG § 1B1.11(a).

is premised on the idea that one cannot produce a false identification document without authentication features. But the statutory definition of a "false identification document" does not require that it contain an authentication feature. 18 U.S.C. § 1028(d)(4). The statute requires merely that it be "intended . . . for the purposes of identification of individuals," that it not be "issued by or under the authority of a governmental entity," and that it "appear[] to be issued by or under the authority of" a governmental entity. *Id.* Thus, a conviction for the production of false identification documents does not require the use of authentication features. Therefore, McWhorter's first argument fails.

Second, McWhorter argues that because the authentication features used in the false driver's licenses that he produced were "false" or "fake," they do not meet the definition of "authentication feature" under the enhancement. Application Note 9(A) in the commentary of USSG § 2B1.1 declares that for purposes of enhancement under subsection (b)(10), "authentication feature" is defined in 18 U.S.C. § 1028(d)(1). That section states that an authentication feature "means any hologram, watermark, certification, symbol, code, image, sequence of numbers or letters, or other feature that either individually or in combination with another feature is used by the issuing authority on an identification document . . . to determine if the document is counterfeit, altered, or otherwise falsified." 18 U.S.C. § 1028(d)(1).

McWhorter notes that § 1028(d)(5)(C) defines a "false authentication feature" to mean an authentication feature that "appears to be genuine, but is not." He argues that he used fake holograms and seals and not the actual ones used on authentic licenses. Therefore, he argues,

because the authentication features he used were false, and false authentication features are not addressed in § 2B1.1(b)(10), the enhancement does not apply.

McWhorter's argument fails for two reasons. First, although the definition of an authentication feature under § 1028(d)(1) is ambiguous as to whether it includes failed attempts to replicate such features, his conduct meets the harm addressed by the enhancement in question. Although § 1028(d)(5) does state that an authentication feature that appears genuine, but is not, is a false authentication feature, the commentary to the enhancement refers only to the definition in § 1028(d)(1). Further, the term "false authentication feature" is only used in § 1028(a)(8) and McWhorter was convicted under § 1028(a)(1), (a)(3), and (a)(5). Additionally, § 1028(d)(5) states that "the term 'false authentication feature' *means an authentication feature* that" meets one of the definitions under sub-parts (A), (B), or (C). (Emphasis added). This wording indicates that false authentication features are a subset of authentication features in general.

Second, McWhorter's reading of § 1028 eliminates § 2B1.1(b)(10)(B)'s production prong because no criminal could ever produce a genuine authentication feature. Section § 1028(d)(5) uses the word "genuine" in the sense that a genuine authentication feature is produced by the issuing authority and not merely that it possess the true qualities of an authentication feature. This is confirmed by a full reading of subsections (A), (B), and (C) of § 1028(d)(5). Thus, if false authentication features in § 1028(d)(5) were read to be dichotomous with authentication features in § 1028(d)(1), then a criminal could never produce an authentication feature because he is not the issuing authority. In other words, a criminal could only produce a false authentication feature. This

would be in direct contradiction to § 2B1.1(b)(10)(B)(ii), which advises a two-point enhancement

if the offense involved "the production . . . of any . . . authentication feature."

Therefore, McWhorter's reading of the USSG § 2B1.1(b)(10) and 18 U.S.C. § 1028 cannot

be reconciled and his argument fails.

B.

McWhorter next argues that the addition of one criminal history point for his 2000 Missouri

conviction for passing a bad check, for which he was sentenced to one year of probation, was

erroneous because it did not meet the requirements under USSG § 4A1.2(c)(1)(B). Specifically, he

argues that the probation office was unable to determine with any degree of specificity the underlying

facts regarding the conviction and that the Missouri statute in question, Mo. Rev. Stat. § 570.120,

is the Missouri version of the insufficient funds statute, and therefore there is no evidence that the

Missouri conviction is a "similar crime" to McWhorter's current conviction.

Section 4A1.1(c) of the Guidelines Manual provides that one point should be added to the

defendant's total in determining his criminal history category for each prior sentence not counted in

subsections (a) or (b). By exclusion, this pertains only to sentences involving less than 60 days of

imprisonment. Section 4A1.2(c)(1) states that sentences for misdemeanors and petty offenses are

counted, except that certain offenses "are counted only if (A) the sentence was a term of probation

of more than one year or a term of imprisonment of at least thirty days, or (B) the prior offense was

similar to an instant offense." The list of conditionally excepted offenses includes the offense of

"[i]nsufficient funds check." USSG 4A1.2(c)(1).

Nos. 10-5939 & 11-6228
*United States v. McWhorter*

Here, the Presentence Investigation Report ("PSR") states that court records related to McWhorter's Missouri conviction show that McWhorter, "with purpose to defraud, passed a $2,750 check, drawn upon Farley State Bank in Parkville, Missouri, payable to KC Autoplex, knowing that such check would not be paid." The district court added one criminal history point under USSG § 4A1.2(c)(1)(B), stating that "the prior offense was similar to an instant offense" and that passing bad checks "is the gravamen of what this conspiracy was all about."

The probation office determined that McWhorter did more than pass an insufficient check. The PSR specifically states that McWhorter committed the crime with the intent to defraud and the knowledge that the check was not payable. This prior offense is similar to the charged conduct in count one and the overall conspiracy in general. Count one of the indictment charged McWhorter with making and possessing, with the intent to deceive, counterfeited securities of various organizations, namely payroll checks. And, as pointed out by the district court, McWhorter's entire scheme revolved around passing unpayable checks. Thus, McWhorter's argument fails.

C.

Lastly, McWhorter argues that the district court did not take into account certain proposed findings of the Sentencing Commission and the pending amendment to remove the recency adjustment of USSG § 4A1.1(e) that added one criminal history point to McWhorter's total. This argument is without merit for two reasons.

First, pursuant to USSG § 1B1.11(a), "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." Therefore, the district court was under no obligation to consider the proposed findings of the Sentencing Commission or any pending amendments.

Second, assuming the district court had any obligation or requirement to consider the aforementioned findings and amendment, it did indeed consider McWhorter's objection. Accordingly, McWhorter's argument fails.

**AFFIRMED**.