**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 14a0080n.06

Case No. 13-5691

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Jan 29, 2014

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| ANTHONY SCOTT, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE: SUTTON, McKEAGUE, and WHITE, Circuit Judges.

SUTTON, Circuit Judge. In Anthony Scott's last visit to this court, a panel held that he invoked his right to counsel shortly after police arrested him in connection with a string of robberies of auto-parts stores. Today's appeal concerns what happened next. After requesting counsel, did Scott initiate communication with police before submitting to additional questioning? And were Scott's subsequent confessions voluntary? The district court answered yes to both questions, and so do we. We affirm.

I.

Police officers arrested Scott on May 28, 2008, after responding to a robbery at an O'Reilly Auto Parts store in Memphis, Tennessee. They found him near the store, noting that he

matched the description of the alleged robber and that he ran when confronted by police. They also found a black jacket, a black ski mask, and a loaded chrome revolver not far from Scott. Various aspects of the robbery matched the profile of several previous Memphis-area crimes. The culprit targeted an auto-parts store on a rainy day, wore a dark jacket, carried a silver revolver and moved around the store in a low crouch ("duck walk[ing]," to be exact—police called him the "squatter robber," R. 164 at 45–46) to avoid being seen from outside.

After arresting Scott and after transporting him to the Memphis Robbery Bureau, police advised Scott of his *Miranda* rights, and Scott invoked his right to counsel. *See United States v. Scott*, 693 F.3d 715, 720 (6th Cir. 2012). The police honored Scott's wishes. All questioning related to the case ended, and the only communications with Scott after that concerned his well-being, things like whether he wanted water or needed to use the restroom.

Detective Hutchison, the lead investigator on the case, decided to move Scott to the City of Bartlett's jail because he did not want to keep Scott in the same facility as his cousin, John Scott, the suspected getaway driver. While Hutchison walked Scott to a transport vehicle for the trip to Bartlett, Scott turned to Hutchison and said, "[H]ey, look, I know I need to talk to y'all, I just can't do it right now, let me get my head together, . . . I will talk to y'all later. . . . I'm tired, let me get some rest, I will talk to you later." R. 89 at 47. Hutchison told Scott to get some rest and get his head straight. If Scott still wanted to talk in the morning, Hutchison added, they could talk the next day.

The next day proved productive for the investigation. On the evening of May 29, the police brought Scott back to the Robbery Bureau, securing him in one of the building's interview rooms. Hutchison offered Scott something to drink and a restroom break. Scott accepted a cup

of water, requested pizza and asked to see his mother and daughter. Hutchison told Scott that he would order food but that he couldn't give Scott any "special privileges" or "favors or anything like that." R. 89 at 73. With these preliminaries out of the way, Scott took a deep breath and said, "I'm ready! Let's do this!" R. 88-7 at 6; *see also* R. 89 at 49. Hutchison stopped Scott before he could say anything else, informed him of his rights under *Miranda* and asked him to sign an advice-of-rights form.

Scott confessed. "[I]f you got any robberies starting in 2005 with somebody wearing a FedEx coat," he told Hutchison, "it's me, I robbed from Whitehaven to Midtown, Midtown to east Memphis, east Memphis to Orange Mound, Orange Mound to Third Street, and Third Street back to Raleigh." *Id.* at 50. "[T]hat's all me," Scott acknowledged. *Id.* Scott detailed his crimes, confessing to six robberies of Memphis businesses. After a pizza-and-pop break at 11:00 pm, Scott made more statements before returning to the Bartlett jail around midnight. The next day saw more *Miranda* warnings and more confessions. Scott admitted to robbing six additional businesses, including four auto-parts stores and two fast-food restaurants. Scott signed the last set of written confessions at 4:40 pm on May 30, and Hutchison allowed Scott to see members of his family.

Before trial, Scott filed a motion to suppress the statements, claiming he did not make them voluntarily and the *Miranda* warnings fell short. The district court denied the motion, and a jury convicted Scott of 16 counts of robbery and of the use of a firearm in a crime of violence. *See* 18 U.S.C. §§ 924(c), 1951. Scott appealed the denial of his motion, and a panel of this court reversed, holding that Scott invoked his right to counsel and that it was not clear who re-initiated the interrogation. The panel remanded the case to the district court "for further factual findings to determine who—Scott or a member of the police—initiated further discussion." *Scott*, 693

3

F.3d at 721. On remand, the district court found that Scott initiated the contact and that his subsequent confessions were voluntary.

II.

When "an accused . . . [expresses] his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities . . . unless [he] himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). The accused "initiates further communication" when he shows "a willingness and a desire for a generalized discussion about the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46 (1983) (plurality); *see United States v. Whaley*, 13 F.3d 963, 967 (6th Cir. 1994).

The record confirms Scott's "willingness" to speak with the police. After requesting counsel and without any prompting from police, Scott told Detective Hutchison, "I know I *need* to talk to y'all, . . . let me get my head together, . . . I *will* talk to y'all later." R. 89 at 47 (emphasis added). The import of these words was not lost on Hutchison, and it is not lost on us. It's not just that Scott was willing to talk; he "need[ed]" to talk, and he desired to talk. Statements of this sort go well beyond what's needed to initiate contact. If "What is going to happen to me now?" suffices to show initiation, *Bradshaw*, 462 U.S. at 1045–46, and if "I'll just talk, that's all . . ." does the same, *United States v. Ware*, 338 F.3d 476, 481 (6th Cir. 2003), surely Scott's statements "I *need* to talk" and "I *will* talk" establish a "willingness" to talk.

What happened the next day shows that Scott's time in rest and in thought at the Bartlett jail did not temper his "desire" to speak with police. Before Hutchison or any other officer asked Scott a case-related question on May 29, Scott launched into a full confession. "I'm ready!

4

Let's do this!" Scott said, explaining to Hutchison that he had "been through this before," that he "kn[e]w the difference between consecutive and concurrent" sentences, and that he hoped his cooperation would help him "get all this stuff pushed together." R. 89 at 49. Scott stopped only when Hutchison read him his *Miranda* rights and asked Scott to sign a waiver form. It was Scott's decision, rationally and freely made, to initiate communication with police about the Memphis robberies, and Scott did so twice: once when he told Hutchison that he would "talk to [police] later"; and once the next day when he confirmed his desire to speak with police, announcing he was "ready" to "do this."

Scott insists that Hutchison initiated contact with him when Hutchison brought him from the Bartlett jail back to the Robbery Bureau on May 29 and 30 for questioning. App. Br. at 24–25. Transporting Scott for questioning after he invoked his right to counsel might have been problematic had Scott not initiated communication on the evening of May 28, inviting further conversation. But the record leaves no doubt that Scott did just that. After invoking his right to counsel, Scott re-initiated conversation with the police, not the other way around.

*United States v. McWhorter*, 515 F. App'x 511 (6th Cir. 2013), offers no refuge to Scott. It suggests that re-interrogating an accused "within three days after [he] had invoked [his] *Miranda* right to counsel" might demonstrate the kind of "badgering" *Edwards* and its successors were designed to prevent. *Id.* at 519 (internal quotation marks omitted). Trying to shoehorn his case into *McWhorter*, Scott notes that police re-interrogated him less than one day after he asked for counsel. App. Br. at 29. But this observation suffers from the same problem as Scott's last argument: It ignores Scott's statement to Detective Hutchison on May 28. When he told Hutchison he needed to talk and he would talk to him later, Scott initiated contact with police and thus satisfied *Edwards* and *McWhorter*.

III.

Scott further argues that even if he re-initiated communications with the police, his subsequent confessions were involuntary—that his "will" was "overwhelmed by official pressure." *United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992). Three questions guide the inquiry: (1) Was the police activity objectively coercive? (2) Was the coercive activity sufficient to overbear the defendant's will? and (3) Was "the alleged police misconduct . . . the crucial motivating factor in the defendant's decision to offer the statement"? *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).

Scott's theory of coercion stumbles over the first step. The district court found that "[o]fficers informed [Scott] of his *Miranda* rights at least fourteen times over three days . . . [and he] signed at least twelve *Miranda* waivers." R. 104 at 12–13. In signing the waivers, Scott acknowledged that he understood his rights, that he still wanted to speak with police, that he wasn't under the influence of any intoxicant, that he didn't suffer from any mental disorder, and that he wasn't in any physical discomfort. That Scott heard the *Miranda* warnings and repeatedly waived his rights to be sure does not preclude a finding of coercion. "But . . . cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that [police] adhered to the dictates of *Miranda* are rare." *Dickerson v. United States*, 530 U.S. 428, 444 (2000) (internal quotation marks and alterations omitted).

Is Scott that "rare" defendant? He thinks so because the police "shackled" him to a bench in a small interview room, prevented him from contacting his family, kept him hungry and deprived him of sleep. App. Br. at 31–33. But the record-supported findings of the district court contradict this scenario at each turn. Begin with Scott's interview room. Scott hangs his hat on

6

the testimony of Officer James Taylor, who, after admitting he is "not real good with measurements," said that he questioned Scott in a room that was "a little larger than a hall closet." R. 163 at 162. On this basis, Scott paints a picture of an accused shackled and surrounded by officers in a cramped space when he confessed. But this description takes artistic license with the record. Police questioned Scott on May 29 and 30 not in some hallway closet, but in the Robbery Bureau's "Interview Room B," a standard, six feet by ten feet room equipped with a conference table, an ankle restraint system that allowed Scott free use of his hands, and a two-way mirror. The room had a doorbell that Scott could use to summon police officers "if he need[ed] someone or something." R. 89 at 78. This run-of-the-mine interview room does not support a claim of coercion.

What about Scott's lack of contact with family members? Detective Hutchison, it is true, asked the Bartlett jail to prohibit Scott from using the telephone during his stay, and he denied Scott's request to speak to his mother and daughter early on the evening of May 29. But Scott was not kept incommunicado. Officer Taylor contacted the mother of Scott's daughter on May 28 to check on the daughter's well-being. And Scott was allowed to call his mother at 11:45 pm on May 29. Even if lack of contact with the outside world supports a claim of police coercion in some settings, *see Miranda*, 384 U.S. at 445–46, this is not one of them.

The record also contradicts Scott's claims of food and sleep deprivation. Police repeatedly checked on Scott's well-being during his time in custody, offering him drinks, restroom breaks and food. The Bartlett jail provided Scott breakfast (pancakes) on May 29, but Scott opted not to eat it. Although police questioned Scott until almost midnight on May 28 and 29, they did not prevent him from sleeping. On May 28, Detective Hutchison told Scott to "go ahead, get . . . some rest" before talking to the police, R. 89 at 47–48, and officers didn't retrieve

Scott from the Bartlett jail until 5:00 pm on May 29 and 11:47 am on May 30. All of this gave Scott plenty of time to rest between interview sessions.

Scott persists that police coerced him by offering a quid pro quo. If he gave a statement to the police, Scott claims to have been told, he would get food and contact with his family. App. Br. at 33. But the only person who supported this theory was Scott, and the district court did not credit his testimony on this score. *See United States v. Esteppe*, 483 F.3d 447, 452 (6th Cir. 2007) ("We afford the district court's credibility determinations regarding witness testimony great deference and must uphold its findings of fact unless they are clearly erroneous.").

IV.

For these reasons, we affirm.