**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Walee Abdulazeem AL–DIN, Mustafa Abdul–Qadir Al–Din, Charles Kunta Lewis, Sr., and Ralphael Remier Crenshaw, Defendants–Appellants.**

**Nos. 14–1660, 14–1646, 14–1672, 14–1673.**

United States Court of Appeals, Sixth Circuit.

Nov. 24, 2015.

BEFORE: MERRITT, DAUGHTREY, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

These consolidated appeals concern defendants' participation in a deadly drug conspiracy. A grand jury indicted Walee Al–Din, Mustafa Al–Din, Charles Lewis, Sr., Ralphael Crenshaw, Demetris Kline, Nicholas Brown, and Dion Lanier for various offenses relating to their involvement in a conspiracy to possess and distribute marijuana, cocaine, and cocaine base. Kline, Brown, and Lanier entered plea agreements and testified against defendants at trial. Defendants challenge their convictions and sentences. For the reasons set forth below, we affirm.

## I.

In the summer of 2010, Walee, Crenshaw, Kline, and Brown were members of a Lansing, Michigan-based gang known as the "Block Burners." The organization's goal was to "[g]et money." Block Burners made their money in two ways: selling drugs and "hitting licks"—a slang term for committing robbery. For "licks," Block Burners targeted other drug dealers, or those they believed had money or drugs that could be sold for a profit. Some also acted as drug middlemen, buying powder cocaine in bulk and reselling it as crack cocaine to individual purchasers. Members carried and sometimes used firearms during robberies and drug transactions.

Though they valued gang loyalty, Block Burners also participated in crimes with

non-gang members, including Walee's brother Mustafa, Lewis, and Lanier. Three of those criminal incidents are at issue in this appeal.

### A.

On the evening of July 12, 2010, Walee, Crenshaw, and non-Block Burners Deandre Luckey and "Haitian P" hatched a plan to rob William Baechler, a paraplegic man who held a medical marijuana license. The four men broke into Baechler's home later that night. One of them went into Baechler's bedroom and threatened him with an unloaded gun. Another beat Baechler's knee with a pistol, breaking his leg so badly that it had to be amputated "because it would never heal." The group left with four to five pounds of marijuana, music recording equipment, and a guitar.

### B.

On July 13, 2010, Kline, Brown, and Lewis robbed drug dealer Tyrice Jones, one of the Block Burners' regular cocaine suppliers. All three men carried firearms for the robbery. According to Brown, "[t]he whole Block Burners had access to th[ose] guns."

Lewis called Jones under the guise of wanting to buy cocaine. When Jones arrived, the three men got inside his truck. Brown removed a rifle from his cargo pants and put it to Jones's head. Jones gave up the money inside his pockets. At defendants' orders, Jones drove to two different homes where he arranged for individuals to come outside with cocaine, more cash, and a "bag full of guns." Defendants split the money and drugs three ways. They later shared the stolen guns with other Block Burners.

### C.

On July 23, 2010, Walee called Brown and Kline and asked if they were "ready to get rich." Defendants assembled at Mustafa's house that evening, along with Kline, Brown, and Lanier. There, Mustafa and Walee explained they wanted to steal marijuana plants owned by Dave Allen, the boyfriend of Shayla Johnson.

Days earlier, Mustafa told Lanier that Johnson showed him "pictures of some big marijuana plants on her phone." Lanier explained that the plants belonged to Allen. Mustafa suggested that they arrange for Walee and his friends to steal the plants. "And he said, '[w]ell, I can have my brother, you know, put down a lick . . . and him and his goons,' which is his friends, 'you know, they can do it for us.'"

To obtain the marijuana, defendants planned to "[s]natch Shayla up," put her in the trunk of Walee's car, bring her to Mustafa's house, and hold her there until she or Allen agreed to take them to the plants. Lewis, Walee, Kline, and Crenshaw retrieved guns for the abduction. Mustafa stayed home while the others went to Johnson's house to kidnap her. Kline still expected Mustafa would get a cut of the proceeds though, "[b]ecause he set it up basically. He was the one—it was his lick basically."

The abduction did not go as planned. Johnson kicked, screamed, and fought back as Kline and Lewis carried her outside to the car, at times dragging her on the pavement. She continued to struggle inside the trunk, sticking out her legs to keep the trunk door open. Frustrated, Lewis told the others to "[w]atch out"; he stood back and fired five rounds at Johnson. Johnson later died of her injuries.

Everyone ran, regrouping at Mustafa's house. Kline had blood on his hands, face, and shirt. He cleaned himself in the bathroom "with like bleach and stuff," intending to "kill the evidence." Later, Kline

gave his clothing to Mustafa, who burned it on the stove. The two men also flushed bloody towels and burnt·clothing down the toilet. Crenshaw and Mustafa wiped down the guns so "fingerprints and DNA wouldn't be on them." Mustafa then hid the guns in a.backyard storage shed.

## D.

Lansing police arrested Mustafa on an unrelated warrant the next day. Detective Kim Kranich interviewed him about the Johnson murder that same evening. After executing a *Miranda* waiver, Mustafa told Kranich that on the day of the murder, six men came to his house to smoke marijuana. Of the six, Mustafa claimed he knew only Lanier. About an hour and a half after the men left, Mustafa heard gunshots and screaming. When he went to his backdoor to check on the noise, he saw the six men running through his backyard. Two of them threatened him with a shotgun and forced him back into his house, where they tied him up and left him· in a room. He claimed that he fell asleep for the remainder of the night but was able to free himself the next morning.

On July 25, 2010, around 4:55 p.m., Detective James Gill interviewed Mustafa and videotaped the discussion. Mustafa executed another *Miranda* waiver at the start of this second interview. Speaking to Gill, Mustafa repeated his story about being tied up by intruders, but now said Lanier called him earlier in the day and asked if he was interested in participating in the robbery. According to Mustafa, Lanier was the one who saw the pictures of marijuana plants on Johnson's phone. Mustafa claimed he told Lanier he was not interested. Gill replied that he knew Mustafa was lying—it was clear from cellular phone records that Mustafa had called Lanier, not the other way around. He confronted Mustafa about the burnt clothing police

found inside his house and the fact that the smoke detectors had been removed. At 5:15 p.m., Mustafa demanded an attorney. "Man, I wanna talk to my lawyer. I think you tryin' to pin all this bullshit on me man."

The interview continued another five minutes after Mustafa's request. Gill told Mustafa he would have a chance to talk to a lawyer "tomorrow," upon being charged with murder. He added that many people in Mustafa's position protest their innocence, only to be found guilty at trial. Gill began walking out the door, saying, "the issue is how much time you going to do.... You're going to prison. How much time? You could talk to me and work this thing out.... So if you wanna go to prison for the rest of your life, that's on you." · Mustafa reminded Gill he had asked for a cigarette. "Can I smoke a cigarette before it, [be]fore we talk again ... ?" Gill agreed, and left the room at 5:20 p.m. Another officer escorted Mustafa out for a cigarette at 5:29 p.m.

Gill met Mustafa back in the interview room at 5:39 p.m. He asked if Mustafa wanted to continue talking. "Yes, sir," Mustafa replied. Mustafa now admitted that Lanier and the other five men planned the robbery while they smoked marijuana at his house. They asked Mustafa for "insight," and Mustafa "gave a little insight"—offering "input as to how they should or should not" go through with the robbery—but reiterated that he did not participate. Mustafa stood by his claim that he was tied up by two men, and now identified Lewis as one of the attackers based on his sizable build. He believed Lewis may have shot Johnson. Also, for the first time, Mustafa claimed he smelled smoke and heard the smoke detectors go off while he was restrained. When he woke up, Mustafa took the detectors off the wall. He was able to free himself, he

explained, because Lewis and the other man "didn't tie [him] up that good."

Gill interviewed Mustafa a third time at 9:35 p.m., again beginning with a *Miranda* waiver. This time, Mustafa revealed that when Lanier said he wanted to commit the robbery, Mustafa told him that Walee might be interested in helping. Mustafa introduced Lanier to Brown, Walee, and "four other guys."

Using redacted interview transcripts, Kranich and Gill testified about their interviews with Mustafa at trial. The redactions eliminated references to Lewis's and Walee's names.

### E.

Following trial, the jury rendered a verdict convicting defendants. Under the conspiracy charge, the jury found Mustafa and Crenshaw guilty of conspiring to possess and distribute marijuana, Walee guilty of conspiring to possess and distribute cocaine and marijuana, and Lewis guilty of conspiring to possess and distribute cocaine, cocaine base, and marijuana. The jury acquitted Walee and Crenshaw of two charges related to the Baechler robbery. For his role in the Jones robbery, the jury convicted Lewis of possession with intent to distribute cocaine and cocaine base, and carrying, using or brandishing a firearm during a drug trafficking crime. Finally, the jury convicted all defendants on the charges related to Johnson's murder: attempted possession with intent to distribute marijuana, and carrying, use, and discharge of a firearm in relation to a drug trafficking crime resulting in death. The jury rendered specific findings that Lewis committed both first-degree premeditated murder and first-degree felony murder, while the remaining defendants committed first-degree felony murder.

### II.

Defendants assert numerous issues on appeal. We address them according to the chronological pattern of trial: pretrial matters, issues related to the indictment, issues arising after the government's case in chief, and sentencing. We incorporate evidentiary claims throughout.

### A.

Before trial, Mustafa moved to suppress the statements he made to Gill following his request for an attorney at 5:15 p.m., including those from the third interview. The government agreed not to seek admission of statements made in the five-minute period between Mustafa's request for an attorney and Gill's exit from the room, but argued that Mustafa waived his asserted right to counsel by voluntarily reinitiating contact with Gill following his cigarette break. The district court agreed and denied the motion. Mustafa claims this ruling was in error.

A criminal defendant is guaranteed the right to counsel during a custodial interrogation under the Fifth and Fourteenth Amendments. *Moore v. Berghuis,* 700 F.3d 882, 886 (6th Cir.2012). "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Supreme Court set the standard for a waiver of the asserted right to counsel in *Edwards v. Arizona:* once the accused invokes his right to counsel, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights"; rather, "the accused himself [must] initiate[ ] further communication, exchanges, or conversations with the police." 451 U.S. 477, 484–85, 101 S.Ct. 1880,

68 L.Ed.2d 378 (1981) (footnote omitted). Thus, after the defendant has requested an attorney, the government "cannot demonstrate a waiver of this right absent the necessary fact" that the defendant himself reopened dialogue with the police "by evinc[ing] a willingness and a desire for a generalized discussion about the investigation." *McKinney v. Ludwick*, 649 F.3d 484, 489 (6th Cir.2011). In this context, we review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Whaley*, 13 F.3d 963, 968 (6th Cir.1994).

It is undisputed that Mustafa was in custody at the time of his statements. Like the district court, we assume Mustafa properly asserted his right to counsel.[1] The government contends that following this request, Mustafa reopened the lines of communication not once, but twice: first, before the cigarette break, when he asked, "Can I smoke a cigarette before it, [be-]fore we talk again?" And again immediately after the cigarette break, when he confirmed to Gill that he wanted to talk again despite his earlier request for an attorney. But "the whole point of *Edwards* is to prevent officials from badgering defendants into waiving their asserted rights to counsel through repeated questioning." *Id.* If the accused reopens dialogue with police agents only after the agents have violated *Edwards* by continuing the interrogation, "no claim that the accused 'initiated' more conversation will be heard." *Hill v. Brigano*, 199 F.3d 833, 842 (6th Cir.1999). That, Mustafa contends, is what happened here: he made both requests to talk only after Gill

warned that he would be charged with murder and threatened to walk out of the room.

█ However, we need not determine whether Gill violated *Edwards* by continuing the interrogation. Assuming that the district court erred in admitting Mustafa's statements, the error was harmless beyond a reasonable doubt given the extensive evidence against him. *United States v. McConer*, 530 F.3d 484, 496 (6th Cir.2008). Lanier, Kline, and Brown testified that Mustafa was the main architect behind the plan to kidnap Johnson. Kline and Brown also stated that he assisted in destroying and concealing evidence by cleaning and hiding firearms and burning bloody clothing. Physical evidence corroborated their testimony. Inside Mustafa's house, police found the keys to the car Johnson was forced into before being shot, along with samples of burnt fabric. A blood stain inside Mustafa's bathroom sink contained female DNA and police were not able to exclude Johnson as the source. The same was true of a bloody shirt recovered from Mustafa's backyard. Police also found the same guns Kline and Brown described as being used in the attack on Johnson in a shed behind Mustafa's house. The most damaging portion of Mustafa's police statement—that he "gave a little insight" as to how defendants should commit the robbery—is far less inculpatory by comparison. Aside from the reference to "insight," Mustafa's statement to Gill largely mirrored the statement he first gave to Kranich, which Kranich repeated before the jury without objection from Mustafa.

---

1. Insofar as the government suggests Mustafa's request for counsel was not sufficiently "unambiguous," *see Berghuis v. Thompkins*, 560 U.S. 370, 381, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010), this argument is waived and abandoned: the government conceded at the hearing on Mustafa's motion that "[h]e

did ask for an attorney" and does not argue that the district court's assumption was clearly erroneous. *See, e.g., United States v. Noble*, 762 F.3d 509, 527 (6th Cir.2014); *United States v. Villareal*, 491 F.3d 605, 611 (6th Cir.2007).

On the whole, we are left with "a fair assurance that the outcome of a trial was not affected by [any] evidentiary error." *United States v. Rayborn,* 491 F.3d 513, 518 (6th Cir.2007).

### B.

■ Following the district court's decision denying the motion to suppress, Walee and Lewis jointly moved under Federal Rule of Criminal Procedure 14 to sever Mustafa, arguing that admission of his statements at a joint trial would violate their confrontation rights under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In response, the government offered proposed redactions of Mustafa's statements eliminating any references to defendants. Finding the redacted statements adequately resolved the *Bruton* issue, the district court denied defendants' motion. Walee and Lewis argue this decision was in error.

We review preserved evidentiary challenges based on the Confrontation Clause de novo. *United States v. Vasilakos,* 508 F.3d 401, 406 (6th Cir.2007). When unpreserved, we review for plain error. *United States v. Ford,* 761 F.3d 641, 652 (6th Cir.2014). Generally, a defendant must contemporaneously object to the introduction of disputed evidence or forfeit his claim on appeal. *Id.* at 653. In this case, Walee and Lewis moved with their codefendants to sever Mustafa's case on the ground that admission of his statements violated *Bruton,* but failed to object when Kranich and Gill used the redacted statements to testify at trial. "Our circuit has not decided whether a motion to sever [alone] preserves a *Bruton* objection. The circuits to consider this question have split on the answer." *Id.* (collecting cases). We do not resolve that question here, because even under de novo review, admission of Mustafa's statements did not violate Walee's and Lewis's confrontation rights. *Id.* at 654.

The Confrontation Clause guarantees a defendant the right to cross-examine a codefendant who incriminates him. *Bruton,* 391 U.S. at 126, 88 S.Ct. 1620. "In *Bruton,* the Supreme Court held that the Confrontation Clause is violated by the introduction of an incriminating out-of-court statement by a non-testifying co-defendant, even if the court gives a limiting instruction that the jury may consider the statement only against the co-defendant." *Ford,* 761 F.3d at 652 (citing *Bruton,* 391 U.S. at 136–37, 88 S.Ct. 1620). Thus, a codefendant's out-of-court statement implicating the defendant cannot be admitted at a joint trial where the codefendant declines to testify. *See Gray v. Maryland,* 523 U.S. 185, 189–90, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998). An exception exists, however, when the statement is "redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 191, 118 S.Ct. 1151; *see also Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). *Bruton* is not a bar to admission of a properly redacted statement accompanied by a limiting instruction, even if the statement "becomes incriminating [to the defendant] when linked with other evidence adduced at trial." *Ford,* 761 F.3d at 654.

The redactions and alterations in this case avoided a *Bruton* violation. Walee's name was replaced with the neutral phrases "someone" and "the guy," and Lewis was not referred to at all. Such redaction is particularly effective in cases like this, where the government alleges "a multifaceted conspiracy in which several individuals engaged in activities." *Vasilakos,* 508 F.3d at 408. In the fifth superseding indictment, the government alleged that five other individuals, aside from Mustafa and Lanier, participated in the

underlying drug trafficking conspiracy and murder. Nothing in the altered statements drew any more attention to Walee or Lewis than to the other coconspirators. The district court also carefully instructed the jury on three separate occasions that testimony regarding the interviews should be considered for the charges against Mustafa alone, including before deliberations. Lewis's claim that the redactions were insufficient when coupled with testimony from Lanier, Brown, and Kline is beside the point. *Bruton* is not triggered merely because a codefendant's statement becomes incriminating "when linked with evidence introduced later at trial." *Richardson*, 481 U.S. at 208, 107 S.Ct. 1702. Defendants have not demonstrated a confrontation error.

## C.

■ Lewis next argues the district court deprived him of his "Sixth Amendment right to conflict-free counsel" by allowing his attorney, Jeffrey O'Hara, to cross-examine Christopher Kasul, a government witness O'Hara once represented. Though Lewis avoids the phrase, his claim ·is better characterized as an assertion that O'Hara's conflict of interest denied him the effective assistance of counsel. *See, e.g., United States v. Kilpatrick*, 798 F.3d 365, 374–75 (6th Cir.2015).

"Whether counsel rendered ineffective assistance is a mixed question of law and fact that we review de novo. We review the district court's underlying factual findings for clear error." *Id.* at 374 (internal citation omitted).

We generally do not entertain claims of ineffective assistance on direct appeal. "The better-reasoned approach is to permit ineffective-assistance claims to be brought in the first instance in a timely motion in the district court under [28 U.S.C.] § 2255." *Massaro v. United States*, 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003). The habeas procedure allows litigation of ineffective assistance claims in the district court, "the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial." *Id.* at 505, 123 S.Ct. 1690. Nevertheless, "we may choose to hear the issue on direct appeal if we find that the parties have adequately developed the record." *United States v. Ferguson*, 669 F.3d 756, 762 (6th Cir.2012).

This is not one of those circumstances. Lewis claims O'Hara could have questioned Kasul more aggressively, but it is not enough to complain that the cross-examination lasted "a mere three pages" and reflected a "powder-puff" approach. Nothing in the record speaks to O'Hara's cross-examination strategy. Because "a defendant must make more than merely speculative assertions," *Bowen v. Foltz*, 763 F.2d 191, 194 (6th Cir.1985), and the record is undeveloped, we decline to reach the merits of Lewis's claim that O'Hara was ineffective due to a conflict of interest.

## D.

Lewis raises several evidentiary claims on appeal. This court reviews a district court's ruling to admit or exclude evidence for an abuse of discretion. *United States v. Kalymon*, 541 F.3d 624, 632 (6th Cir. 2008). "When reviewing for an abuse of discretion, we view 'the evidence in a light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" *United States v. Deitz*, 577 F.3d 672, 688 (6th Cir.2009) (quoting *United States v. Jackson*, 473 F.3d 660, 668 (6th Cir.2007)). In this regard, the question is not whether the evidence is prejudicial, but whether it is unfairly so. Unfair prejudice "does not mean the dam-

age to the defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis." *United States v. Mendez–Ortiz,* 810 F.2d 76, 79 (6th Cir.1986). "We reverse only where the district court's erroneous admission of evidence affects a substantial right of the party." *United States v. White,* 492 F.3d 380, 398 (6th Cir.2007) (citing Fed.R.Evid. 103(a)).

However, when a party "objects to the submission of evidence on specific grounds in the trial court, but on appeal the party asserts new grounds challenging the evidence," our review is limited to plain error. *United States v. Evans,* 883 F.2d 496, 499 (6th Cir.1989). Plain error means: "(1) an error occurred; (2) the error was obvious or clear; (3) the error affected [the defendant's] substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Mayberry,* 540 F.3d 506, 512 (6th Cir.2008).

### 1.

■ Lewis first contends that the district court abused its discretion in admitting a letter he wrote in jail while awaiting trial. He attacks the letter on three grounds: (1) that the evidence was insufficient to identify him as the letter's writer; (2) that the letter was prejudicial due to its indication that Lewis was in prison; and (3) its "frequent use[ ] of the 'N' word." Before the district court, Lewis objected to the letter on the basis that it revealed he was in prison, but did not object to its admission on the two other bases he asserts on appeal. His first and third claims are therefore reviewed for plain error. *Evans,* 883 F.2d at 499.

"To satisfy the requirement of authenticating an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed.R.Evid. 901(a). "[P]roponents of exhibits may ... prove their authenticity with circumstantial evidence." *United States v. Crosgrove,* 637 F.3d 646, 658 (6th Cir.2011). The letter at issue included Lewis's name, an inmate number, and a prison address. Lewis stipulated that, as of the date the letter was postmarked, he was an inmate in the same prison, with the same inmate number. Police recovered the letter after arresting a man who claimed to be Lewis's nephew for speeding. The letter's signature line, signed, "Uncle Big Chuck," corroborated this claim. Brown and Kline referred to Lewis as "Big Chuck" throughout trial. Substantively, the letter referred to a rap video Brown posted on Youtube following Johnson's murder. In short, there was overwhelming evidence "to support a finding that the item [was] what the [government] claims it [was],"—a letter written by Lewis. Fed.R.Evid. 901(a). The district court did not plainly err in admitting it.

■ Lewis next challenges the letter's admission on prejudice grounds under Federal Rule of Evidence 403. He submits the letter was unfairly prejudicial because it disclosed his incarceration to the jury. Lewis compares his case to *United States v. Wesley,* 417 F.3d 612 (6th Cir. 2005). The defendant in *Wesley* was recorded on tape talking to a government informant he attempted to recruit for a bank robbery. He told the informant that he and another man went to prison together for an undisclosed offense, adding, "[w]e got caught, we went to trial. Ain't nobody tell on nobody. You know what I'm sayin'?" *Id.* at 621. This court ruled that the trial court erred in failing to exclude the statement as overly prejudicial pursuant to Rule 403: "reference to defendant's prior

incarceration presents a classic danger of unfair prejudice—that the jury may decide guilt based on the fact that the defendant has a prior conviction. This is particularly a concern where the evidence presents a close question on the sufficiency of the evidence." *Id.* at 622.

*Wesley* does not control this case. For one, this is not an instance where sufficiency of the evidence presents a close question. Kline, Brown, and Lanier all testified to Lewis's involvement in the Jones robbery and Johnson murder. Secondly, before filing a joint motion in limine to exclude the letter, Lewis submitted a trial stipulation agreeing that the jury could be informed that he was in prison at the same correctional facility, under the same inmate number, on the date the letter was postmarked. Nor did he bother to condition the stipulation on the district court's decision to admit the letter. Lewis does not explain how he suffered unfair prejudice from the jury's exposure to information he agreed it could hear. Third, unlike the statement in *Wesley*, the letter demonstrated Lewis's concern that he would go to prison for murdering Johnson—a factor the jury may fairly consider. *See, e.g., United States v. Cody,* 498 F.3d 582, 591–92 (6th Cir.2007) (affirming admission of the defendant's statements about suicide as probative of consciousness of guilt).

Lewis's final claim (also unpreserved), that the letter should have been excluded as unfairly prejudicial because it included racial epithets, is without merit. Even where the probative value of the evidence is "low," the prejudice occasioned by derogatory language is generally insufficient to warrant exclusion. *See United States v. Caver,* 470 F.3d 220, 241–42 (6th Cir.2006) (affirming the lower court's admission of the defendant's letters which "used foul language and derogatory terms for counsel and the criminal justice system"). That

principle controls here. Lewis has not shown the district court plainly erred or abused its discretion in admitting the letter.

### 2.

Lewis also challenges the district court's admission of threat-related evidence, specifically (1) a neighbor witness's statement that an unidentified individual threatened him for testifying, (2) Lanier's claim that Block Burners threatened and beat him for speaking to police, and (3) Kranich's testimony that Mustafa requested protection for himself and his girlfriend during their interview. Lewis failed to object to any of this testimony at trial and must therefore demonstrate the trial court plainly erred in admitting the evidence. *Deitz,* 577 F.3d at 683.

Evidence that a defendant threatened to harm the witnesses against him may be "relevant to prove [the] defendant's plans and motives." *United States v. Clark,* 988 F.2d 1459, 1465 (6th Cir.1993). A defendant's attempt to keep witnesses from testifying may be viewed as a tacit acknowledgement of the strength of the witnesses' testimony. *See United States v. Copeland,* 321 F.3d 582, 597 (6th Cir.2003). "It is reasoned that threats against a witness constitute an effort by the defendant to tamper with the substance of the government's case, and thus are probative of a defendant's awareness that the government is likely to prevail at trial." *Id.* Consequently, evidence of threats against witnesses is "usually considered admissible," "subject to the balancing of the statement's probative value and prejudicial effect pursuant to Fed.R.Evid. 403." *Id.*

Part of the government's theory for the conspiracy charge was that defendants shared a strict code of loyalty and silence. Brown testified that the Block Burners' oath was not to "fold" by talking to police

about criminal activities. Defendants' efforts to enforce that code by causing, and threatening to cause, harm to others was relevant to demonstrate defendants' consciousness of guilt and group association. *Id.* at 597; *see also Deitz,* 577 F.3d at 689–90 (testimony about government witnesses' placement in a witness protection program "was relevant to the [gang's] history of violence and reputed practice of retaliating against witnesses and informants"); *United States v. Etheridge,* 424 F.2d 951, 954, 964 (6th Cir.1970) (the defendants' group plot to murder coconspirator who had been "talking to the FBI" was proof that the conspiracy was ongoing). Additionally, the fact that none of the evidence identified Lewis as the source of these threats lessened the prejudice to him. *See Deitz,* 577 F.3d at 689–90. Apart from a blanket claim that the threat-related evidence was "highly prejudicial and inflammatory," Lewis does not explain how its probative value was outweighed by unfair prejudice. *Cf. Copeland,* 321 F.3d at 598–99 (evidence of the defendants' threats against the prosecutor should have been excluded as unfairly prejudicial because "threats against a prosecutor do not imply a defendant's intention to destroy evidence"). He has not shown plain error.

### E.

In his own evidentiary claim, Mustafa contends the admission of (1) Lewis's letter, and (2) witness testimony concerning incriminating statements Lewis and Walee made in jail violated his rights under *Bruton* because he never had an opportunity to cross-examine Lewis or Walee. Our review of this issue is limited to plain error, as Mustafa did not preserve a confrontation claim in the district court by objection or otherwise. *See Ford,* 761 F.3d at 652.

Mustafa's *Bruton* claim fails for the same reason Walee's and Lewis's *Bruton* claim fails—he was not identified by name, or by neutral pronoun, in any of the complained of evidence. Mustafa's confrontation rights are not violated merely because the jury may infer a reference to him by linking this evidence with the other proofs presented at trial. *Richardson,* 481 U.S. at 208, 107 S.Ct. 1702. We find no plain error.

### F.

■ Walee, Mustafa, and Lewis next complain that the district court erred under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by affirming the prosecution's strike of Juror 61. We disagree.

"*Batson* protects a criminal defendant's constitutional right 'to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria.'" *Harris v. Haeberlin,* 752 F.3d 1054, 1058 (6th Cir. 2014) (quoting *Batson,* 476 U.S. at 85–86, 106 S.Ct. 1712). Analysis of a *Batson* challenge involves three sequential steps. *Id.*

> First, "the opponent of the preemptory strike must make a prima facie case that the challenged strike was based on race." Second, if a prima facie case is established, the prosecution must articulate a race-neutral explanation for the strike. Because the burden of persuasion remains on the challenger to demonstrate purposeful discrimination, the prosecution's articulated explanation "need not be particularly persuasive or plausible." Third, the trial court "must ... assess the plausibility of the prosecution's explanation in light of all the evidence to determine whether the defendant has met his burden of proving purposeful discrimination."

*Id.* (quoting *United States v. Lawrence,* 735 F.3d 385, 443 (6th Cir.2013)). The district court's determination on a *Batson* claim is entitled to "great deference," *see id.* at 1060, and "must be sustained unless it is clearly erroneous." *Snyder v. Louisiana,* 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008).

"When the district court rules on a prosecutor's explanation for a preemptory challenge after an objection to the challenge, 'the question ... boils down to whether the appellants established by a preponderance of the evidence that the preemptory strikes were intentionally discriminatory.' " *United States v. Gibbs,* 182 F.3d 408, 439 (6th Cir.1999) (quoting *United States v. Tucker,* 90 F.3d 1135, 1142 (6th Cir.1996)). The government offered two nondiscriminatory reasons for striking Juror 61. First, prior to seeing Juror 61, the prosecutor rated him low based on his juror questionnaire responses indicating that he had only a ninth grade education and difficulty hearing. Second, Juror 61 admitted that his judgment may be clouded by his belief that the criminal justice system treats African–American men unfairly. Additionally, the prosecutor pointed out that another African–American would be serving on the jury panel.

Defendants counter that Juror 61 was able to hear clearly during voir dire. They posit the prosecutor's educational concern "was simply a thin disguise for racial discrimination." Further, they contend Juror 61 affirmed his ability to render a fair verdict after discussing his views with the district court. These arguments miss the mark. The government's reasons for dismissing Juror 61 need not be well-founded; they need only be race-neutral. *Copeland,* 321 F.3d at 599. Lack of education is a race-neutral reason to strike Juror 61, *see United States v. Carter,* 483 F. App'x 70, 73 (6th Cir.2012) (addressing juror who

had not graduated high school), as is his "view that racial discrimination may taint the criminal justice system," because neither condition is "based on the race of the prospective juror," *United States v. Steele,* 298 F.3d 906, 914 (9th Cir.2002). Defendants offer no evidence that the government failed to request exclusion of Caucasian prospective jurors possessing these same traits. As the district court found, Juror 61's belief in the unfairness of the system would be a "natural concern[ ]" for the government. *See Felkner v. Jackson,* 562 U.S. 594, 595–98, 131 S.Ct. 1305, 179 L.Ed.2d 374 (2011) (per curiam) (in the habeas context, describing the government's exclusion of a juror based on his belief that he was targeted by police due to race and age as a "race-neutral explanation"). The court did not err in finding the government articulated legitimate, race-neutral reasons for dismissing Juror 61.

G.

■ Walee and Mustafa argue the district court erred in denying defendants' joint motion to sever count one of the fifth superseding indictment—the conspiracy charge—from counts two through seven. Count one alleged defendants, along with Lanier, Brown, and Kline, were "members and associates of a local violent street gang known as the Block Burners." The object of the conspiracy was to possess with the intent to distribute marijuana, cocaine, and cocaine base in violation of 21 U.S.C. §§ 841 and 846. The charge also alleged that defendants robbed Baechler and Jones, and murdered Johnson, in furtherance of the conspiracy. The government charged the three criminal episodes as substantive offenses in the remaining counts.

Federal Rule of Criminal Procedure 8 explains the conditions under which multi-

ple offenses may be joined in a single indictment:

> The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed.R.Crim.P. 8(a). "Whether joinder was proper under Rule 8(a) is determined by the allegations on the face of the indictment." *Deitz*, 577 F.3d at 691. Issues of joinder are reviewed de novo, but a finding of misjoinder is subject to the harmless error standard, permitting reversal only if the misjoinder affects substantial rights. *United States v. Locklear*, 631 F.3d 364, 368–69 (6th Cir.2011) (citing Fed. R.Crim.P. 52(a)). Rule 8 is generally construed in favor of joinder, though "it is also true that failure to meet the requirements of this rule constitutes a misjoinder as a matter of law." *Cody*, 498 F.3d at 586.

Assuming joinder complies with the requirements of Rule 8, the district court retains discretion under Rule 14 to "order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires," if the joinder of offenses or defendants in an indictment prejudices any defendant, or the government. Fed.R.Crim.P. 14(a). The standard for severance is high: "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). A risk of prejudice may occur where "many defendants are tried together in a complex criminal case and they have markedly different degrees of culpability," or "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Id.* Still, even with a significant risk of prejudice, lesser measures such as limiting instructions will typically suffice. *United States v. Ross*, 703 F.3d 856, 884 (6th Cir.2012). Thus, to demonstrate the necessity of severance, a defendant must show "compelling, specific, and actual prejudice from [the] court's refusal to grant the motion to sever." *Id.* at 885.

Unlike joinder under Rule 8(a), which is limited to a review of the indictment, the propriety of ordering separate trials under Rule 14(a) is focused on the evidence likely to be presented at trial. *United States v. Chavis*, 296 F.3d 450, 457–58 (6th Cir. 2002). "That is why challenges under Rule 14 must be renewed at the close of the evidence (to see if the joinder prejudiced the defendant at trial), but challenges under Rule 8 need not be renewed." *United States v. Baltimore*, 482 F. App'x 977, 980 (6th Cir.2012).

Just as they did in defendants' joint motion to sever before the district court, Walee and Mustafa blur the lines between Rules 8(a) and 14(a) on appeal by "focus[ing] entirely on the *evidence offered at trial* and how [they] apparently [were] prejudiced by it, rather than on the correctness of joining the offenses *in the indictment.*" *Id.* (footnote omitted). They complain that the government's proofs showed that some codefendants were not Block Burners, and that they were prejudiced by the presentation of gang-related evidence. But these are evidence-based assertions relating purely to Rule 14(a), not 8(a). In fact, the indictment does not itself allege that all defendants were members of the Block Burners—it alleges de-

fendants were "members and associates" of the gang. Although the joint severance motion cited both rules, it substantively asserted only Rule 14–based claims, meaning that Walee and Mustafa were required to renew it at the close of evidence. Because they failed to do so, we review this issue only for plain error. *United States v. Fields,* 763 F.3d 443, 456 (6th Cir.2014).

Walee and Mustafa have not demonstrated the requisite level of prejudice to warrant severance of the conspiracy charge. Had defendants been tried for conspiracy separately, evidence of gang affiliation would still have been admissible against them. "Evidence of gang affiliation is relevant where it demonstrates the relationship between people and that relationship is an issue in the case, such as in a conspiracy case." *Ford,* 761 F.3d at 649; *see also Gibbs,* 182 F.3d at 430 ("Gang affiliation is particularly relevant, and has been held admissible, in cases where the interrelationship between people is a central issue.").

Here, the evidence of defendants' affiliation with the Block Burners was relevant to "demonstrate[ ] the relationship amongst the co-conspirators," *Ford,* 761 F.3d at 650, including Mustafa, who was capable of conspiring with the gang regardless of the fact that he was not a member. *See, e.g., United States v. Warman,* 578 F.3d 320, 330, 337–38 (6th Cir. 2009). Further, "[j]uries are presumed to be capable of following instructions, like those given in this case, regarding the sorting of evidence and the separate consideration of multiple defendants." *United States v. Walls,* 293 F.3d 959, 966 (6th Cir.2002). The jury was able to parse the

evidence without being improperly swayed by references to gang-activity: it acquitted Walee on two counts related to the Baechler robbery, and found Mustafa guilty of conspiring to distribute only marijuana, not cocaine, despite the fact that count one alleged the Block Burners trafficked in both narcotics. "The jury's demonstrated ability to compartmentalize the evidence and evaluate how the evidence applies to separate, interrelated charges undermines [the] prejudice argument." *United States v. Soto,* 794 F.3d 635, 657 (6th Cir.2015).[2]

■ Crenshaw also asserts that the district court should have severed his trial from that of his codefendants, though he did not request a separate trial. We review this unpreserved claim for plain error. *Fields,* 763 F.3d at 456.

Crenshaw argues he was unfairly prejudiced by the joint trial because it allowed the government to introduce evidence of his codefendants' trafficking in cocaine and cocaine base, despite charging Crenshaw with only marijuana-related crimes. Regardless of whether Crenshaw is correct in asserting that cocaine carries a "different perception" in the public eye than marijuana, concern over negative perception falls short of the "compelling, specific, and actual prejudice" necessary to warrant severance. *See Ross,* 703 F.3d at 885. Before deliberations, the district court adequately instructed the jury to consider the evidence against each defendant separately, particularly with regard to the conspiracy charge. Crenshaw has not demonstrated plain error.

### H.

■ Lewis next argues the trial court abused its discretion in admitting a chart

2. In addition to joining defendants' motion to sever count one, Mustafa individually moved for a separate trial under Rule 14(a), and challenges the district court's decision denying the motion. Mustafa failed to preserve

this issue and relied on the same unfounded theory of unfair prejudice due to gang-related evidence. As explained, we find no error in the district court's rejection of that theory.

displaying his phone calls to other defendants because the evidence was insufficient to link him to the phone number police identified as his own. We review the district court's ruling to admit disputed evidence for an abuse of discretion. *Kalymon*, 541 F.3d at 632.

The evidence admitted at trial included records of numerous cellular phone calls between defendants. Detective Lee McCallister explained that police obtained search warrants to gather defendants' phone records dating between July 1, 2010, and August 26, 2010. Police used the records to create charts demonstrating defendants' call histories, which were admitted as exhibits at trial. McCallister testified that on the night of the murder, police received the first 9–1–1 dispatch at 10:51 p.m. Phone records from the same time period showed defendants made a "pretty regular group of calls" to each other between 10:50 p.m. and 11:18 a.m. the next day.

Federal Rule of Evidence 901 "prescribes the manner in which evidence can be authenticated or identified. Rule 901(a) states that evidence is admissible if there is satisfactory corroboration that the evidence is what it purports to be." *United States v. Harris*, 786 F.3d 443, 446 (6th Cir.2015) (citation omitted). Most relevant here, Rule 901(b)(6)(A) provides that a telephone conversation may be authenticated through "evidence that a call was made to the number assigned at that time to ... a particular person," if circumstances "show that the person answering was the one called." McCallister testified that police identified Lewis's phone number from the contacts section of his son Charles Lewis, Jr.'s cellular phone under the name "Dad."[3] Police used the phone

number to track Lewis's location via GPS and arrest him after the murder. The fact that Lewis was found and arrested with the cellular phone bearing the number identified by the police is more than sufficient to demonstrate he was the individual who made and received calls from that number. Lewis has not shown that the district court abused its discretion.

## I.

The government relied on the cellular phone evidence to support count seven of the fifth superseding indictment, which charged all defendants with violating 18 U.S.C. § 924(j). Section 924(j) makes it a crime to cause the death of another while committing a violation of 18 U.S.C. § 924(c), using or carrying a firearm in relation to a crime of violence or drug trafficking. *See* 18 U.S.C. § 924(c) and (j). Section 924(j) provides for an increased penalty when the death caused is a murder as defined in 18 U.S.C. § 1111. *See* 18 U.S.C. § 924(j)(1)–(2). In its verdict, the jury accepted the government's theory that all defendants committed first-degree murder—Lewis both premeditated murder and felony murder, and the others felony murder, because they were committing a felony (kidnapping) when Lewis shot Johnson.

## 1.

Walee contends his conviction should be reversed because the government failed to prove that the botched attempt to kidnap Johnson was a federal crime. In Walee's view, the attack on Johnson cannot constitute the predicate felony necessary to sustain a felony murder conviction unless it was a federal kidnapping as defined in 18

---

**3.** Lewis's 13–year–old son Charles Jr. was a member of the Block Burners. According to the government, he was convicted in Michigan state court as a juvenile for his role in Johnson's murder.

U.S.C. § 1201(a). Federal jurisdiction under that provision requires the defendant to use an "instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense." 18 U.S.C. § 1201(a)(1). Walee does not dispute that defendants used their cellular phones to orchestrate and facilitate the kidnapping. Rather, he argues the government failed to satisfy the jurisdictional element of Section 1201(a)(1) because a cellular phone is not an "instrumentality of interstate commerce" when used only to make intrastate phone calls. We review this question of statutory interpretation de novo. *See United States v. Wagner,* 382 F.3d 598, 606–07 (6th Cir.2004).

█ At the outset, the government suggests the court need not reach this issue; it submits that the kidnapping need not be a federal offense in order to act as the predicate felony for the felony murder conviction. According to the government, § 924(j) refers to 18 U.S.C. § 1111 only to incorporate the definition of murder in § 1111(a). It does not additionally incorporate § 1111(b)'s jurisdictional requirement that the death occur within the special maritime and territorial jurisdiction of the United States because § 924(j) takes its federal jurisdiction element from the underlying § 924(c). In other words, because § 924(j) prohibits causing the death of another while using or carrying a firearm in relation to a crime of violence or drug trafficking as prohibited under § 924(c), once federal jurisdiction is established under § 924(c), it is necessarily also established under § 924(j). Thus, the government reasons it did not have to prove the predicate felony for the felony murder charge was a federal crime. We agree.

In *United States v. Ostrander,* 411 F.3d 684, 687 (6th Cir.2005), this court considered whether, in addition to incorporating the definition of murder from 18 U.S.C. § 1111(a), § 924(j) also incorporated its counterpart penalty in 18 U.S.C. § 1111(b). The *Ostrander* court held it did not. "Following the Fourth Circuit, we agree with [the defendant] that § 924(j) 'incorporates only the definition of murder contained in section 1111[ (a) ].'" *Id.* (quoting *United States v. Young,* 248 F.3d 260, 275 (4th Cir.2001)) (alteration referring to subsection 1111(a) in original). Stated another way, § 924(j) incorporates only § 1111(a), and not § 1111(b). *Id.* Like the penalty provision in *Ostrander,* the jurisdictional provision at issue here appears in § 1111(b). Thus, the government is correct in arguing that § 1111's jurisdictional requirement does not carry over to § 924(j). It was therefore not required to prove that the kidnapping was a federal offense to sustain a felony murder conviction, and Walee's interstate commerce argument fails *ab initio.*[4]

The result is the same if Walee's claim is considered on the merits. It is well-established that "cellular telephones, even in the absence of evidence that they were used to make interstate calls, have been held to be instrumentalities *of* interstate commerce." *United States v. Weathers,* 169 F.3d 336, 341 (6th Cir.1999). It is undisputed defendants used their cellular phones to arrange the kidnapping and in its immediate aftermath. Accordingly, the government proved a federal kidnapping, though it was not required to do so. *See* 18 U.S.C. § 1201(a)(1).

### 2.

█ For the same reasons, we reject Lewis's unpreserved claim that the district

---

4. Lewis's and Walee's corresponding claim that the district court erred in sentencing them for first-degree murder because the predicate felony was not a federal offense is likewise without merit.

court erred in instructing the jury that a cellular phone was an instrumentality of interstate commerce, rather than allowing the jury to decide this issue. "When, as here, certain items have been deemed instrumentalities as a matter of law, the only fact question left for the jury is whether the Defendants used them." *United States v. Morgan*, 748 F.3d 1024, 1034 (10th Cir.2014). The district court properly limited the jury to that question. Its instructions were not erroneous, much less plainly erroneous.

## J.

 Walee, Crenshaw, and Lewis argue that the proofs presented at trial demonstrated three independent conspiracies, rather than the single conspiracy alleged in count one. Ordinarily, we review de novo the question of whether the evidence at trial varied from charges in the indictment. *Warman*, 578 F.3d at 341. "A variance occurs when the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Hughes*, 505 F.3d 578, 587 (6th Cir.2007). If the indictment charges one conspiracy, but the evidence presented can reasonably be construed to support only a finding of multiple conspiracies, "the resulting variance between the indictment and the proof is reversible error, if the appellant can show he was prejudiced thereby." *Fields*, 763 F.3d at 467.

"When a defendant first alleges a variance at trial, this Court will reverse a conviction if 'a variance occurred and that variance affected [the defendant's] substantial rights.'" *United States v. Swafford*, 512 F.3d 833, 841 (6th Cir.2008) (quoting *Caver*, 470 F.3d at 235). "But where the issue is first raised on appeal, as here, we review for plain error ... which requires the defendant to prove that the error affected the outcome of the district court proceedings." *Id.* (citation omitted). To determine whether a single, or multiple, conspiracies have been shown, we consider the evidence in a light most favorable to the government. *Hughes*, 505 F.3d at 587.

Walee, Crenshaw, and Lewis claim that the evidence presented at trial demonstrated not one, but three different conspiracies—one for the Baechler robbery, another for the Jones robbery, and a third for the Johnson murder. Defendants emphasize that each crime involved different groups of coconspirators, often with non-Block Burners playing central roles. As defendants see it, the government cannot establish a single "umbrella" conspiracy absent proof that each coconspirator was a member of the Block Burners, and a participant in each criminal act committed in furtherance of the conspiracy. This is not the case.

"The principal considerations in determining the number of conspiracies are the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings." *United States v. Smith*, 320 F.3d 647, 652 (6th Cir.2003). "To prove a single conspiracy, the government need only show that each alleged conspirator had knowledge of and agreed to participate in what he knew to be a collective venture directed toward a common goal." *Id.* at 653.

Viewing the evidence in a light most favorable to the government, a jury could reasonably find defendants had knowledge of, and agreed to participate in, a single, overarching conspiracy to obtain and sell narcotics. The goals of the Baechler robbery, Jones robbery, and Johnson abduction were all the same: steal the victim's money and drugs and sell the drugs for profit. *See id.* at 652. That defendants may have formed smaller groups to carry

out the first two criminal acts is irrelevant; the "mere fact that a conspiracy can be subdivided ... does not mean that multiple conspiracies existed." *Fields*, 763 F.3d at 468. Nor does it matter that Kline and Brown barely knew Mustafa. "[A] single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy." *Smith*, 320 F.3d at 653. In the same vein, a defendant need not belong to a gang in order to conspire with gang members. *E.g. Warman*, 578 F.3d at 330, 337–38 (affirming the non-gang member defendant's conviction for conspiring to distribute narcotics with gang members). Mustafa, Lewis, and Lanier were capable of conspiring with Kline, Brown, Crenshaw, and Walee regardless of their non-Block Burner status.

For the agreement element, "[t]he government need not prove that each defendant knew every detail of a charged conspiracy," but instead only "that each defendant adopted the conspiracy's main objective." *United States v. Amawi*, 695 F.3d 457, 476 (6th Cir.2012). Kline and Brown testified that Block Burners expected to assist other Block Burners with robberies and shared access to the same firearms. Before committing each of the three criminal incidents alleged in furtherance of the conspiracy, defendants, or various groups of defendants, met and developed specific plans to carry out the robberies and the abduction. *See id.* at 477 (the defendants' meeting in preparation for "joining jihadists" demonstrated a "collective venture" aimed at "killing or maiming United States military personnel"). Lewis, Walee, Crenshaw, Kline, and Brown also participated in at least two of the three incidents, demonstrating their knowledge

that the conspiracy was ongoing. Taken together, these acts "may reasonably be interpreted as participation in a common plan," thereby "establish[ing] an implicit agreement." *Id.*

There was also evidence that defendants were generally aware of one another's criminal activities, regardless of whether they participated in those activities. Following the Jones robbery, for example, Walee called Luckey and told him that Brown, Kline, and Lewis had robbed Jones. Kline and Brown shared the guns they stole from Jones with Crenshaw and Charles Jr. And although Mustafa and Lanier participated only in the Johnson murder, Mustafa's role in planning the kidnapping indicated that he and Lanier were aware of their codefendants' prior conduct. Mustafa told Lanier that they could get Walee's "goons" to commit the robbery for them, and showed Lanier the AK–47 he kept for Walee in his garage. *See Smith*, 320 F.3d at 653 (jury could infer that the defendants learned of "prior robberies and the continuing nature of the scheme" from their coconspirator, and therefore agreed to the conspiracy). Beyond "mere association," *Hughes*, 505 F.3d at 588, this evidence demonstrates defendants knew of, and shared, an overall plan to traffic narcotics. And defendants' group conduct continued after the murder, as they worked together to clean blood and fingerprints off the guns, destroy blood-stained clothing, and threaten government witnesses. Cooperative efforts to conceal and destroy evidence further support a conclusion that defendants knowingly agreed to their roles in the conspiracy. *Etheridge*, 424 F.2d at 964; *see also, e.g., Caver*, 470 F.3d at 233 (conspiracy demonstrated in part through the defendants' joint efforts to evade law enforcement). On this record, the jury could reasonably infer defendants participated in a single,

shared conspiracy. The evidence did not impermissibly vary from the indictment.

### K.

 Lewis is the only defendant raising a sufficiency claim. He contends the evidence was insufficient to support the jury's finding of premeditated murder. "We review sufficiency of the evidence challenges de novo to determine 'whether, after viewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Mathis,* 738 F.3d 719, 735 (6th Cir.2013) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). A sufficiency claim does not require us to "weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Jackson,* 470 F.3d 299, 309 (6th Cir.2006). Rather, we "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *Id.*

Premeditated murder is "the unlawful killing of a human being with malice aforethought," perpetrated by "poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated" means. 18 U.S.C. § 1111(a). "A killing is premeditated when it is the result of planning and deliberation." *See United States v. Garcia–Meza,* 403 F.3d 364, 371 (6th Cir.2005) (approving premeditated murder jury instructions). "The amount of time needed for premeditation of a killing depends on the person and the circumstances. It must be long enough for the killer, after forming the intent to kill, to be fully conscious of that intent." *Id.*

Lewis maintains there was not enough time for premeditation. It is true that the plot to kidnap Johnson did not originally include any intent to kill her. The goal was to hold her until she or Allen revealed the location of Allen's marijuana plants. Lewis characterizes his conduct as closer to second-degree murder, since he shot Johnson in the immediacy of the moment to stop her from screaming and fighting after he forced her into the trunk.

Before she died, however, Johnson gave a different account of the attack. She told Police Officer Angela Matthews that one of the men who attacked her shot her inside the living room first, then carried her out to the trunk where he shot her four more times. Someone yelled out, "[k]ill her" before the first shot was fired. Though Brown and Kline claimed the shooting did not occur until after Johnson was in the trunk, it is undisputed that they identified Lewis as the shooter. Neighbor Ben Price corroborated Johnson's version of events, testifying that he heard two separate "quick bursts" of gunfire. Assuming that the first shot was not premeditated, the time it took Lewis to carry Johnson out to the car and fire four more rounds was sufficient for him to "form[ ] the intent to kill, [and] to be fully conscious of that intent." *Garcia–Meza,* 403 F.3d at 371; *see also United States v. McDaniel,* No. 97–5233, 1998 WL 661106, at *5 (6th Cir. Sept. 2, 1998) (affirming the defendant's sentence under an increased offense level based on his intent to commit premeditated murder, where the defendant shot a police officer six times in less than ten seconds). "This conclusion is consistent with the case law, which indicates that there is no particular time interval necessary to constitute premeditation; instead, it is sufficient if the defendant had some prior design to commit murder." *United States v. Bishop,* No. 97–1175, 1998 WL 385898, at *7 (6th Cir. July 1, 1998) (the fact that the defendant had "an interval of time [in which he] could have backed off" supported a finding of premeditation). Af-

terward, Lewis told Brown that he killed Johnson because she had "seen too much of his face,"—a near admission that he formed an intent to kill her and, in fact, acted upon that intent. The evidence against Lewis is not insufficient merely because the jury credited Matthews's testimony over Brown's and Kline's. Viewing this evidence in a light most favorable to the prosecution, a rational trier of fact could have found Lewis guilty beyond a reasonable doubt of first-degree, premeditated murder.[5]

### L.

■■ Lewis next contends he was denied a fair trial due to prosecutorial misconduct. Because he did not object to the prosecutor's statements during closing argument, we review his claim for plain error. *United States v. Henry*, 545 F.3d 367, 376 (6th Cir.2008).

Our court applies a two-step analysis to resolve questions of prosecutorial misconduct. "First, we determine whether prosecutorial statements allegedly constituting misconduct were improper. Next, if we find impropriety, we 'then determine whether the improprieties were flagrant such that reversal is warranted.'" *United States v. Eaton*, 784 F.3d 298, 309 (6th Cir.2015) (citation omitted) (quoting *United States v. Kuehne*, 547 F.3d 667, 687 (6th Cir.2008)). Under the flagrancy prong, the court considers four factors: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberate or accidentally made; and (4) wheth-

er the evidence against the defendant was strong." *Id.*

Lewis's first argument relates to Mustafa's redacted interview statements. Consistent with *Bruton*, the district court directed the jury on three separate occasions—including before deliberations—to consider these statements with regard to the charges against Mustafa alone. Still, Lewis asserts that the prosecutor undercut those instructions by remarking how Mustafa's statements corroborated testimony from Lanier, Kline, and Brown:

> I already talked to you about Mustafa Al–Din's statement to Detective Gill. He wasn't telling the whole truth, but what he did cough up corroborates what you heard.

Just as *Bruton* does not bar admission of a redacted statement that becomes incriminating when viewed in conjunction with other evidence presented at trial, *see Gray*, 523 U.S. at 195, 118 S.Ct. 1151, a prosecutor does not undermine a *Bruton* instruction by encouraging the jury to do what *Bruton* allows: view a redacted statement in conjunction with other evidence presented at trial. This statement was not improper.

Second, Lewis attacks the prosecutor's reference to gang association during the government's rebuttal, which he asserts amounted to an improper propensity argument. Yet, these comments must be viewed "in the context of the trial as a whole." *Henry*, 545 F.3d at 377. In the complained of instance, the prosecutor referred to gang affiliation evidence when discussing the conspiracy charge. Again, this evidence was relevant to demonstrate the relationship amongst coconspirators. *Ford*, 761 F.3d at 649–50. The prosecu-

---

5. Because the evidence was sufficient to sustain Lewis's first-degree murder conviction under a premeditation theory, we decline to address his claim that the evidence was insuf-

ficient to sustain the conviction under a felony murder theory, because the kidnapping was "incidental to" the planned robbery.

tor's characterization of the evidence was also accurate; it demonstrated that all defendants were themselves Block Burners, or, like Lewis, associated with the Block Burners through individual criminal acts. Lewis has not demonstrated this argument was improper.

Lastly, Lewis disputes the prosecutor's remarks about the DNA evidence found on the rifle used to kill Johnson:

> It's been suggested to you by [Lewis's counsel] ... that the DNA evidence, unless it's a hundred percent match, doesn't mean a thing and don't consider it.
>
> Well, I guess it's nice to wish it didn't mean anything, or in the case of Mr. Lewis pretend there's no trace DNA left on the murder weapon, but the fact is, you've heard the testimony, it's there. It's there. And it didn't exclude these guys. So it's there for you to consider.

Citing testimony from evidence technician Lisa Ramos, Lewis points out Ramos "wasn't able to make any conclusive determination regarding" whether he was the source of the DNA on the rifle. Lewis reasons that the prosecutor mischaracterized the evidence by stating otherwise. "Misrepresenting facts in evidence can amount to substantial error because doing so may profoundly impress a jury and may have a significant impact on the jury's deliberations. For similar reasons, asserting facts that were never admitted into evidence may mislead a jury in a prejudicial way." *Joseph v. Coyle*, 469 F.3d 441, 474–75 (6th Cir.2006) (citations omitted).

Neither concern applies here. Ramos and forensic scientist Lori Bruski testified about the DNA testing process at length. They explained that there must be sufficient biological material on the item tested to develop a full DNA profile that satisfies a statistical "threshold." When the threshold is satisfied, the police can render a statistically conclusive determination such that they are "able to say there's this amount of certainty that we know the [individual's DNA] profile" is present in the sample. Failure to satisfy the threshold does not *necessarily* mean that the individual's DNA is not present on the item tested in any amount. Instead, it may mean that, although an individual's DNA is present, the DNA profile is insufficient to make a determination considered statistically conclusive.

This was the case with Lewis. Ramos confirmed that a DNA profile matching Lewis was present on the firearm, but it "fell below the threshold—or a number fell below the threshold where [she] wasn't able to make a statistical calculation." Consequently, she could neither identify nor exclude Lewis as the source of the DNA on the rifle with statistical certainty. The prosecutor's comment that Lewis's DNA was "there" and not "exclude[d]" was therefore not a mischaracterization of the evidence, particularly since it came in response to Lewis's counsel's argument that there were "no DNA matches of Mr. Lewis on any piece of evidence in this entire case." *See Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir.2001). Lewis has not demonstrated that any of the prosecutor's statements were improper, and the trial court did not plainly err by declining to limit the prosecutor's argument sua sponte.

### M.

■ Walee and Mustafa argue that the district court erred in denying their request for a voluntary manslaughter instruction. We review a district court's refusal to give a requested jury instruction on a lesser-included offense for an abuse of discretion. *United States v. LaPointe*, 690 F.3d 434, 439 (6th Cir.2012). "But if a defendant is entitled to such an instruc-

tion, 'it is generally reversible error' not to give it." *Id.* (quoting *United States v. Waldon*, 206 F.3d 597, 604 (6th Cir.2000)).

A defendant is entitled to an instruction on a lesser-included offense where: (1) a proper request is made; (2) the elements of the lesser offense are identical to part of the elements of the greater offense; (3) the evidence supports a conviction on the lesser offense; and (4) the proof on the element or elements differentiating between the two crimes is sufficiently disputed so that a jury could consistently acquit on the greater offense and convict on the lesser. *United States v. Jones*, 403 F.3d 817, 821–22 (6th Cir.2005). Courts compare the elements of the lesser and greater offenses to determine whether they overlap. *Id.* at 822.

"Manslaughter is the unlawful killing of a human being without malice." 18 U.S.C. § 1112(a). Manslaughter is voluntary when it occurs "[u]pon a sudden quarrel or heat of passion." *Id.* Felony murder, the first-degree murder charge applied to Walee and Mustafa, is "the unlawful killing of a human being with malice aforethought," with the malice aforethought prong satisfied where the victim is killed during the perpetration of an enumerated felony, such as kidnapping. 18 U.S.C. § 1111(a).

Defendants here requested the voluntary manslaughter instruction, but do not satisfy the second part of the test because the elements of the offenses are not the same—felony murder requires malice aforethought, and manslaughter requires the absence of malice. Mustafa and Walee point out that the government conceded this point in the district court, agreeing that the elements of voluntary manslaughter were identical to part of the elements of felony murder. That much is true. But "[p]arties may not stipulate to the legal conclusions to be reached by the court." *Neuens v. City of Columbus*, 303 F.3d 667,

670 (6th Cir.2002). We are not bound by the prosecution's mistaken legal stipulation. Defendants were not entitled to a voluntary manslaughter instruction, and the district court did not abuse its discretion by declining to give one.

## III.

All defendants raise sentencing claims. We review the reasonableness of a district court's sentencing determination under the deferential abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 46, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). "The reasonableness of a district court's sentence 'has both substantive and procedural components.'" *United States v. Herrera-Zuniga*, 571 F.3d 568, 581 (6th Cir.2009) (quoting *United States v. Jones*, 489 F.3d 243, 250 (6th Cir.2007)). "Consequently, our reasonableness review requires inquiry into both the length of the sentence and the factors evaluated and the procedures employed by the district court in reaching its sentencing determination." *United States v. Cochrane*, 702 F.3d 334, 344 (6th Cir.2012). A sentence is procedurally unreasonable if, for instance, the district court improperly calculates the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, ignores the factors set forth in 18 U.S.C. § 3553(a), renders a sentence based on clearly erroneous facts, or fails to adequately explain a chosen sentence. *Gall*, 552 U.S. at 51, 128 S.Ct. 586. We review the district court's interpretation of the Guidelines de novo, and its factual findings at sentencing for clear error. *United States v. Walters*, 775 F.3d 778, 781 (6th Cir.2015).

### A.

Walee's first procedural unreasonableness claim, which Crenshaw joins, is that the district court miscalculated the Guidelines range by adopting the two-level

enhancement for restraint of the victim in the course of the offense under U.S.S.G. § 3A1.3. The application notes to that section provide:

> Do not apply this adjustment where the offense guideline specifically incorporates this factor, or where the unlawful restraint of a victim is an element of the offense itself (*e.g.*, this adjustment does not apply to offenses covered by § 2A4.1 (Kidnapping, Abduction, Unlawful Restraint)).

(U.S.S.G. § 3A1.3 Application Note 2). Walee and Crenshaw contend that because the Johnson murder was "characterized as murder in the first degree based on attempted kidnapping," the district court erred by "factoring restraint into its calculation of the guidelines range." They concede their burden to demonstrate plain error due to their failure to preserve this issue. *United States v. Morgan*, 687 F.3d 688, 694 (6th Cir.2012). They have not carried that burden.

Based on the jury's finding that they committed first-degree felony murder, Walee and Crenshaw both started with a base offense level of 43, *see* U.S.S.G. § 2A1.1, which corresponds to life imprisonment—the highest sentence available under the Guidelines. The district court noted that the two levels added for unlawful restraint of the victim increased their total offense levels to 45. Nevertheless, the court applied offense level 43 in its sentencing decisions, recognizing that the Guidelines simply do not provide for any greater sentencing range. In effect, the two-level addition did not place defendants in any worse position—whether the offense level was 43, or 45, the Guidelines range provided for a life sentence.

A procedural error in miscalculating the Guidelines range does not rise to the level of plain error affecting substantial rights unless the sentencing court also fails to apply the correct Guidelines range. *Compare United States v. McCloud*, 730 F.3d 600, 602–04 (6th Cir.2013) (although the district court committed procedural error by sentencing the defendant under an incorrect statutory sentencing range, the defendant had not shown plain error, because his sentence was still within the correct Guidelines range) *with United States v. Story*, 503 F.3d 436, 438–40 (6th Cir.2007) (miscalculation plainly erroneous where it resulted in application of the incorrect Guidelines range). Thus, even assuming the district court erred by initially adding two levels to Walee's and Crenshaw's total offense levels, this procedural error did not affect defendants' substantial rights because it did not change the applicable Guidelines range. *McCloud*, 730 F.3d at 603. Defendants' claim therefore fails.

### B.

■ Walee's and Crenshaw's next procedural unreasonableness claim fares no better. They argue the district court should have granted them a two-level acceptance-of-responsibility reduction under U.S.S.G. § 3E1.1(a), though neither asked for one. More specifically, defendants contend that conditioning a two-level reduction on "clear[ ] ... acceptance of responsibility," *see* U.S.S.G. § 3E1.1(a), unconstitutionally burdens their Fifth and Sixth Amendment rights to remain silent and force the government to carry its weight at trial. Defendants did not raise this issue at sentencing, and we review it for plain error. *Morgan*, 687 F.3d at 694.

The acceptance-of-responsibility reduction "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1 Application Note 2. Our precedent

squarely forecloses defendants' claim that this limitation violates their constitutional rights. Addressing whether § 3E1.1 "violates the Fifth and/or Sixth Amendments," we have found "that on its face, § 3E1.1 is constitutional." *United States v. Cordell*, 924 F.2d 614, 619 (6th Cir. 1991); *see also United States v. Clemons*, 999 F.2d 154, 161 (6th Cir.1993). Though *Cordell* left open whether § 3E1.1 could be unconstitutional in application, Walee and Crenshaw have not identified any particular circumstances showing the provision is unconstitutional as applied to them. No plain error occurred.

### C.

 Mustafa contends that his 600–month sentence is substantively unreasonable. In reviewing substantive reasonableness, we inquire into the length of the sentence and the factors the district court evaluated in reaching the sentencing determination. *Cochrane*, 702 F.3d at 345. Our focus is "whether a sentence is adequate, but not 'greater than necessary to accomplish the sentencing goals identified by Congress in 18 U.S.C. § 3553(a).'" *Id.* (quoting *Herrera–Zuniga*, 571 F.3d at 590). This inquiry "take[s] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* Sentences within the Guidelines are presumed substantively reasonable. *Id.* By contrast, "[a] sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, or gives an unreasonable amount of weight to any pertinent factor." *Id.*[6]

Mustafa was sentenced on a base offense level of 43 for first-degree murder, which calls for life imprisonment under the Guidelines. Applying the § 3553(a) factors, the district court granted Mustafa a "modest[ ]" downward departure to 600 months (50 years). Because Mustafa's sentence is below the Guidelines recommendation, he faces an "even more demanding" task in persuading the court that his sentence is unreasonable. *United States v. Curry*, 536 F.3d 571, 573–74 (6th Cir.2008).

Mustafa argues that the district court impermissibly considered whether he could earn early release based on the Federal Bureau of Prisons award of credit for good behavior. He cites no case law for this proposition. More to the point, he mischaracterizes the district court's decision. The court did not consider good-time credit as a stand-alone factor in sentencing; it considered whether a 600–month sentence would be sufficient to serve the purposes of punishment and deterrence even if Mustafa earned early release. Section 3553 requires the court to address these very needs. *See* 18 U.S.C. §§ 3553(a)(2)(A)–(2)(B). Consideration of whether these needs would be satisfied when accounting for possible early release was not improper. Further, the district court's decision included a thorough reflection on "the seriousness of the offense," the importance of "promot[ing] respect for the law," and "avoid[ing] ... sentence disparities" unless warranted by defendants' differing conduct. *See* 18 U.S.C. §§ 3553(a)(2)(A) and (a)(6). Mustafa's below-Guidelines-range sentence was not based on an impermissible factor or substantively unreasonable.

---

6. Walee also appears to raise a substantive reasonableness claim, but offers no argument beyond stating the standard of review. We will not supply one for him. *United States v. Stewart*, 729 F.3d 517, 528 (6th Cir.2013).

**D.**

■ Finally, Mustafa, Walee, and Lewis allege that they should be granted a new trial due to cumulative error. Cumulative error exists when "the combined effect of individually harmless errors [is] so prejudicial as to render [a defendant's] trial fundamentally unfair." *Deitz*, 577 F.3d at 697. At most, this case involves only a single harmless error against Mustafa, leaving no "combined" effect to consider. Defendants have not demonstrated entitlement to a new trial.

**IV.**

We affirm the district court's judgment.